623 A.2d 410

The PROCTER & GAMBLE PAPER PRODUCTS
COMPANY, Petitioner,

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued Dec. 17, 1992.

Decided March 11, 1993.

Robert P. Haynes, III and Edward J. Grenier, Jr., for petitioner.

John A. Levin, Asst. Counsel, for respondent.

Kent D. Murphy, Asst. Consumer Advocate, for intervenor, Office of Consumer Advocate.

John J. Gallagher, for intervenor, PA Gas and Water Co.

Before COLINS and PELLEGRINI, JJ., and BLATT, Senior Judge.

PELLEGRINI, Judge.

The Procter and Gamble Paper Products Company (Procter and Gamble) appeals from an order of the Pennsylvania Public Utility Commission (PUC) dismissing its complaint filed

against the Pennsylvania Gas and Water Company (PG & W). In its complaint, Procter and Gamble alleged that PG & W failed to provide Procter and Gamble with access to PG & W's interstate pipeline capacity on a year-round basis. The PUC dismissed the complaint on the basis that it lacked subject matter jurisdiction to resolve that issue.

This case deals with the natural gas industry and the transportation and sale of natural gas to end user/customer Procter and Gamble. Procter and Gamble's appeal specifically raises the question as to which agency, the PUC or the Federal Energy Regulatory Commission (FERC), has jurisdiction to determine whether it can purchase natural gas on the open market and order PG & W to transport the gas using its capacity on the Tennessee Gas pipeline on a year-round basis.

## I.

This appeal arises as a result of a rate proceeding settlement agreement entered into between PG & W and Procter and Gamble in 1989.[1] In that agreement, PG & W agreed to provide Procter and Gamble with a portion of its interstate pipeline capacity on an experimental basis for four months during the winter season commencing January 21, 1990.[2] The parties also agreed that after the four month period had expired, PG & W could continue to offer Procter and Gamble a

---

1. Initially, PG & W filed changes to its annual tariffs in 1989 pursuant to Section 1307(f) of the Public Utility Code (Code), 66 Pa.C.S. § 1307(f), which governs the recovery of purchased gas costs for natural gas distributors with gross intrastate annual operating revenues in excess of $40,000,000. Under that section, any party may advise the PUC that there is a significant difference between the natural gas costs to the utility and the costs reflected in the tariff, which the PUC then investigates to determine the reasonableness of the tariff. In this case, Procter and Gamble filed a complaint against PG & W's proposed changes and also argued its right to purchase a portion of PG & W's interstate pipeline capacity for transmission of natural gas to its pulp processing and paper plant in Mehoopany, Wyoming County, Pennsylvania.

2. The parties agreed that PG & W would provide this service to Procter and Gamble for up to 12,000 Mcf per day during the experimental four month period. One Mcf, which is the standard unit for measuring the volume of natural gas, equals one thousand cubic feet of natural gas.

portion of its capacity on the interstate pipeline without further PUC approval, providing PG & W wished to do so. After PG & W refused to continue offering Procter and Gamble transportation services, Procter and Gamble filed a complaint with the PUC, arguing not only that it was entitled to continuing service, but that it was entitled to that service on a year-round basis.[3]

While PG & W was willing to continue providing Procter and Gamble with a portion of its interstate pipeline capacity for four months during the winter in 1991 as it had previously in 1990, Procter and Gamble requested that the PUC order PG & W to provide it year-round capacity.[4] PG & W opposed this request, concluding that it was unable to do so without harming its other customers, and the PUC lacked jurisdiction to grant the request. Agreeing, the Administrative Law Judge (ALJ) hearing the case recommended to the PUC that Procter and Gamble's complaint be dismissed for lack of subject matter jurisdiction, because the case involved interstate transportation of natural gas which was under the exclusive jurisdiction of the FERC. As such, the PUC did not have jurisdiction to hear the dispute or order PG & W to assign a portion of its interstate pipeline capacity to Procter and Gamble. The ALJ further noted that if Procter and Gamble wanted any relief, it would have to file an appropriate complaint with the FERC.

On exceptions from the ALJ's recommended decision, the PUC determined that it was appropriate for PG & W to continue providing Procter and Gamble with a portion of its pipeline capacity on a four-month basis during the winter

3.  Procter and Gamble filed this complaint after PG & W filed its 1990 Section 1307(f) filing in which it sought to increase rates. Procter and Gamble also alleged in its complaint that PG & W's proposed rates were unjust and did not reflect the lowest cost of gas as required by the Code. Several other customers of PG & W's also filed Petitions to Intervene on issues related to the increased rates. A Joint Petition for Settlement was filed with the PUC, which the PUC approved, in which all issues regarding PG & W's increased rates were resolved between all the parties, with the exception of Procter and Gamble.

4.  Procter and Gamble did not make any arguments regarding the rates which PG & W had charged for the four months of service.

months based upon PG & W's agreement to do so. However, the PUC severed the issues regarding year-round service and jurisdiction from the rate proceeding, and remanded the case to allow Procter and Gamble to proceed with the complaint in a separate proceeding. The PUC noted that the following issues were to be addressed in future proceedings: 1) whether the PUC had subject matter jurisdiction over a dispute pertaining to the interstate pipeline capacity of a Local Distributing Company (LDC); 2) whether granting Procter and Gamble's demand would constitute unjust discrimination against other customers; 3) whether the allocation of interstate pipeline capacity by PG & W to Procter and Gamble would comport with PG & W's least cost procurement obligation; and 4) the price which should be paid for such interstate pipeline capacity allocation service on a permanent basis.

On remand to the ALJ, Procter and Gamble proposed the following arrangement to obtain a portion of PG & W's interstate pipeline capacity on a year-round basis: Procter and Gamble would negotiate natural gas contracts directly with the producers, but PG & W would purchase the gas from the producers and then use its capacity on the interstate pipeline to transport the gas into Pennsylvania and sell the gas to Procter and Gamble. Title to the gas would only transfer to Procter and Gamble after the interstate transportation had occurred. Even though Procter and Gamble would negotiate directly with the producer and obtain a lower price for the natural gas it required for its plant, capacity brokering would not take place and the arrangement would not be subject to FERC approval, because PG & W would have title to the gas and use its own interstate capacity.[5]

After hearings, the ALJ again issued a recommended decision to dismiss Procter and Gamble's complaint for lack of subject matter jurisdiction. The ALJ determined that the arrangement which Procter and Gamble proposed was nothing

---

5. Procter and Gamble was not proposing a "sale for resale" arrangement, whereby it would purchase the gas directly from the producer, resell it to PG & W which would use its own capacity on the interstate pipeline to transport the gas into Pennsylvania, and then purchase the gas from PG & W at which time it would take title to the gas.

more than capacity brokering because it involved interstate transportation, and, therefore, fell exclusively under the FERC's jurisdiction. The ALJ noted:

> We find Complainant's position to be inconsistent: it wants this Commission to become a participant in a subterfuge whereby gas purchased by Procter & Gamble is treated as though it is the property of PG & W until it arrives in Pennsylvania, at which time PG & W "sells" the gas to Procter & Gamble. Thus, it wants us to treat this transaction as though Procter & Gamble is a sales customer. Conversely, the said Complainant also wants us to treat it as a transportation customer by allowing it to pay rates which are lower than those charged to sales customers.

This time the PUC adopted the ALJ's decision and dismissed Procter and Gamble's complaint. Procter and Gamble then filed this appeal.

Procter and Gamble now urges us to remand this case to the PUC on the basis that the PUC has jurisdiction to hear this case because it deals with an agreement involving intrastate transportation. Procter and Gambler further claims that the PUC has the authority to order PG & W to enter into its proposed agreement which provides for both interstate and intrastate transportation but avoids the FERC's approval. Prior to addressing these issues, however, it is necessary to examine the structure and regulation of the natural gas industry.

## II.

The natural gas industry is primarily divided into three segments: the production of natural gas at wells scattered throughout the country, the shipment of the gas by transmission companies via interstate pipelines to LDCs, and the removal of natural gas from pipelines by LDCs for sale to customers or end users. In order for an LDC to receive gas to sell to its end users, it purchases capacity on an interstate or intrastate pipeline from the transmission companies. This capacity is also referred to as "transportation" services. The purchase of capacity ensures that the LDC is allocated a

certain percentage of the capacity of the pipeline to transport gas to provide sufficient gas to its customers.[6]

The FERC has jurisdiction over all agreements dealing with interstate transportation pursuant to Section 717(b) of the Natural Gas Act (NGA). 15 U.S.C. § 717(b) provides the following:

> The provisions of this chapter shall apply to the *transportation of natural gas in interstate commerce,* to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or the production or gathering of natural gas. (Emphasis added.)

Agreements dealing with intrastate transportation, however, are exempt from the FERC's scrutiny and fall under the PUC's jurisdiction pursuant to Section 717(c) of the NGA[7] and Section 104 of the Code, 66 Pa.C.S. § 104.[8]

6. In this particular case, natural gas is produced at wells in Texas and the Gulf coast, and is shipped north to Pennsylvania via the Tennessee Gas Pipeline Company's transmission line (Tennessee Gas pipeline.) PG & W, an LDC, purchases from the Tennessee Gas Pipeline Company capacity on the Tennessee Gas Pipeline so that it can carry gas from the wells to its customers in Columbia, Lackawanna, Luzerne, Lycoming, Montour, Northumberland, Union, Snyder and Wyoming counties.

7. 15 U.S.C. § 717(c) of the NGA provides in relevant part:
The provisions of this chapter shall not apply to any person engaged in or legally authorized to engage in the transportation in interstate commerce or the sale in interstate commerce for resale, of natural gas received by such person from another person within or at the boundary of a State if all the natural gas so received is ultimately consumed within such State, or to any facilities used by such person for such transportation or sale, provided that the rates and service of such person and facilities be subject to regulation by a State commission. The matters exempted from the provisions of this chapter by this subsection are declared to be matters primarily of local concern and subject to regulation by the several States.

8. Section 104 of the Code, 66 Pa.C.S. § 104, provides that the provisions of this part, except when specifically so provided, shall not apply, or be construed to apply, to commerce with foreign nations, or among the several states, except insofar as the same may be permitted under

■ Transportation of natural gas was first regulated in 1938 when Congress passed the NGA. At that time, customers purchased natural gas directly from the local distributing company which purchased the gas from the producer. However, with the industry rapidly changing and customers wishing to be more involved in their own purchases of natural gas, different types of purchasing arrangements evolved. The first type of agreement, known as a "buy/sell" agreement, is one where the customer scouts out the gas it wishes to purchase, the LDC purchases the gas from the producer at the behest of the customer, and the customer purchases the gas from the LDC. In such a case, the LDC holds title to the gas specifically purchased for the end user while it utilizes its capacity rights to transport the gas over the interstate pipeline. Title actually passes to the end user after it is delivered by the LDC. *See El Paso Natural Gas Company, et al. (El Paso IV),*[9] 60 FERC ¶ 61,117 at p. 61,386 (1992).

■ A consumer seeks to enter into a buy/sell agreement because it is both convenient to purchase gas directly from the LDC, and, more importantly, it is assured of a specific quantity of natural gas not subject to allocation by the LDC when supplies are tight. Intrastate buy/sell agreements, involving pipelines which begin and end in Pennsylvania and do not require any interstate transportation in order for the consumer to purchase the gas, are regulated by the PUC. Interstate buy/sell agreements, which involve the interstate transportation of gas, are regulated by the FERC.

■ Under a second type of agreement, known as a "capacity brokering" agreement, the end user purchases gas directly from the producer and pays the LDC a fee to utilize a portion of the LDC's capacity on the interstate pipeline to transport the gas to its own facility. Essentially, the LDC is assigning a

the provisions of the Constitution of the United States and the acts of Congress.

**9.** *El Paso Natural Gas Company, Transwestern Pipeline Company, Pacific Gas Transmission Company, Windward Energy & Marketing Company v. Pacific Gas Transmission Company and Pacific Gas & Electric Company.*

portion of its capacity to its customer. Title passes to the end user at the time of purchase so that the end user holds title to the gas throughout the interstate portion of its transportation. *See Transcontinental Gas Pipe Line Corporation,* 52 FERC ¶ 61,277 at p. 62,085 (1990) and *Texas Eastern Transmission Corporation,* 37 FERC ¶ 61,260 at p. 61,685 (1986).

Consumers enter into these types of agreements when they needs more gas than an LDC has capacity to provide, because they are able to deal directly with the producer and purchase the needed quantity. Also, when dealing directly with the producer, consumers can generally negotiate for a better price than when purchasing the gas directly from the LDC. However, a drawback of this type of arrangement is that the consumer needs to then purchase capacity on the pipeline which may not always be available.

The FERC has traditionally regulated capacity brokering agreements and has required its approval of such agreements because it has found that the assignment of capacity controls access to capacity, and, therefore, is tantamount to transportation.[10] The FERC has identified three requirements which must be part of any capacity brokering agreement: 1) the brokering of capacity must be on an unduly non-discriminatory basis; 2) the rates charged must be no higher than the as-billed rate charged by the interstate pipeline; and 3) the assigning party must periodically report the details of each assignment to the FERC. *See Texas Eastern Transmission Corporation,* 48 FERC ¶ 61,248 at p. 61,873 (1989).

The FERC has also continuously attempted to ensure the existence of a competitive market and access to transportation services by customers on a non-discriminatory basis who utilize capacity brokering agreements. "Non-discriminatory" means that sellers of gas do not have a competitive advantage over each other, and customers have the benefit of competitively priced gas supplies and customers are served on

10. *See El Paso Natural Gas Company,* 54 FERC ¶ 61,318 at pp. 61,980 and 61,991 and *Transwestern Pipeline Company,* 54 FERC ¶ 61,301 at p. 61,999.

a first-come, first-served basis. In an effort to achieve this balance, the FERC issued Order No. 436 on October 9, 1985,[11] in which it described this objective and indicated that the rule intended to prohibit undue discrimination or preference in the quality of service, duration of service, categories, prices or volumes of gas, and customer classification, including whether transportation would displace sales to existing customers of the transportation pipeline. *See* 50 Fed.Reg. at 42,426.

In 1992, however, the FERC came to the conclusion that it could no longer adequately monitor capacity brokering arrangements to ensure that all allocations were non-discriminatory. Pursuant to FERC Order No. 636 issued on April 8, 1992,[12] the FERC decided that to further place gas purchasers on equal footing and place all transportation transactions under one non-discriminatory program, it would not authorize any new capacity brokering agreements and would institute a "capacity releasing program." Under the new capacity releasing program, an LDC's unwanted pipeline capacity would be made available to others seeking capacity by releasing the excess capacity to the open market so that other LDCs and end users would have an equal chance to bid for the released capacity.

Regarding buy/sell agreements, the FERC determined that they would no longer be necessary because under the capacity releasing program, capacity holders would be able to release unwanted capacity to persons seeking capacity. Along those lines, the FERC specified that after the date when a pipeline's capacity releasing program went into effect, no new buy/sell deals could be executed after that date, and all allocations of interstate pipeline would have to be done under the capacity releasing program. However, buy/sell agreements existing prior to that time would be grandfathered, providing that the LDC involved in the agreement was not giving up any of its capacity. We assume that the FERC's new policy does not affect the propriety of intrastate buy/sell agreements.

11. This is found at 50 Fed.Reg. 42,408 (1985) (codified at 18 C.F.R. §§ 2, 157, 250, 284, 375 and 381).

12. 57 Fed.Reg. 13,276 (1992) (codified at 18 C.F.R. part 284).

### III.

■ Procter and Gamble's argument is essentially twofold. First, Procter and Gamble argues that the PUC erred by dismissing its complaint, because the arrangement Procter and Gamble has proposed to obtain a portion of PG & W's capacity on a year-round basis is an intrastate buy/sell agreement.[13] Second, Procter and Gamble argues that because it is an intrastate buy/sell agreement, it is not regulated by the FERC, but rather by the PUC, which can order PG & W to enter into the arrangement it proposes in order that it can obtain gas on a year-round basis.[14]

Procter and Gamble contends that its proposed agreement is an intrastate buy/sell agreement by focusing on the fact that title would not pass to it until after the interstate transportation occurred. Although Procter and Gamble acknowledges that this is not a typical buy/sell agreement, because it would be negotiating directly with the producer of the gas, it directs our attention to the four successive *El Paso Natural Gas Company* cases,[15] and argues that in this line of cases, similar

13. Procter and Gamble also argues that the PUC erred by finding that it had the burden of proof at the hearing, because PG & W had the burden of proving its rate changes were just and reasonable pursuant to Section 315(a) of the Code, 66 Pa.C.S. § 315(a). However, because this case turns on whether the PUC has subject matter jurisdiction, this is a non-issue.

14. Procter and Gamble also argues that the PUC has already asserted jurisdiction over the service it seeks, because twice it ordered PG & W to provide Procter and Gamble with the agreed-upon four months of service. However, this argument ignores the fact that the PUC merely ordered PG & W to act on the settlement agreement which was in place prior to Procter and Gamble's request for additional service.

15. *El Paso Natural Gas Company (El Paso I)*, 54 FERC ¶ 61,318. Order amending El Paso's blanket certificate to enter into capacity brokering agreements.

*El Paso Natural Gas Company (El Paso II)*, 56 FERC ¶ 61,289 (1991). Order vacating prior order, rejecting compliance filings, dismissing rehearing and establishing technical conference.

*El Paso Natural Gas Company, Transwestern Pipeline Company, Pacific Gas Transmission Company, Windward Energy & Marketing Company v. Pacific Gas Transmission Company and Pacific Gas & Electric Company (El Paso III)*, 59 FERC ¶ 61,031 (1992). Order dismissing rehearings in part, denying rehearings in part, denying relief and dismissing complaint.

purchase arrangements were made and considered intrastate buy/sell agreements.

In *El Paso I*, Southern California Gas Company (SoCal) and Pacific Gas and Electric Company (PG & E) were attempting to get the FERC's approval of their individual purchase programs which they contended were intrastate buy/sell agreements. Under SoCal's agreement, the consumer would purchase the gas from the producer, sell it to the LDC, the LDC would use its capacity on the interstate pipeline to bring it into California for the consumer, and the LDC would resell the gas to the consumer. Title would only pass to the consumer, however, after the gas was transported over the interstate pipeline. A similar arrangement existed under PG & E's proposed buy/sell agreement.

However, contrary to Procter and Gamble's belief, the FERC did not determine that these were intrastate buy/sell agreements, but rather that the California Public Utility Commission wanted to be accorded flexibility to fashion a yet undefined market based allocation methodology by integrating intrastate and interstate transportation. Nonetheless, in *El Paso II*, the FERC requested that a technical conference take place to determine the status of these agreements. However, in *El Paso III*, the FERC determined that regardless of the status of the agreements, an analysis was unnecessary due to its Order No. 636 which was issued the same day and mandated that buy/sell and capacity brokering agreements would no longer be permitted. This decision was affirmed in *El Paso IV*. Not only did the FERC fail to acknowledge that the agreements proposed by SoCal and PG & E constituted buy/sell agreements and appeared to be an attempt to receive the benefits of both interstate and intrastate transportation services, but it made it clear that regardless of the status of the agreements, they would be prohibited pursuant to FERC order No. 636.

*El Paso Natural Gas Company, Transwestern Pipeline Company, Pacific Gas Transmission Company, Windward Energy & Marketing Company v. Pacific Gas Transmission Company and Pacific Gas & Electric Company (El Paso IV)*. 60 FERC ¶ 61,117 (1992). Order denying rehearing and clarifying prior order.

■ Similarly, in this case, although Procter and Gamble refers to its proposed agreement as an intrastate buy/sell agreement, interstate transportation of the gas would be required in order for the gas to reach its facility. The fact that title passes only after the gas enters Pennsylvania is not enough to change the status of the proposed agreement from either an interstate buy/sell agreement or capacity brokering agreement to an intrastate buy/sell agreement which falls under the PUC's jurisdiction. While Procter and Gamble's proposed scheme is creative, the PUC is not required to characterize it as Procter and Gamble does, and as the ALJ aptly characterized it, "participate in a subterfuge." Further, Procter and Gamble is seeking a combination buy/sell agreement and capacity brokering agreement, and, regardless of what it calls such a unique arrangement, both agreements involve interstate transportation and fall within the exclusive jurisdiction of the FERC.[16] Consequently, the PUC lacks jurisdiction to hear this case.[17]

Accordingly, the decision of the PUC dismissing Procter and Gamble's complaint is affirmed.

16. Even though Procter and Gamble characterizes its proposed agreement as an intrastate buy/sell arrangement so that the PUC rather than the FERC has jurisdiction, it then argues that such an agreement is permissible under the grandfathering clause of FERC Order No. 636. Ignoring the obvious internal inconsistency in this argument because FERC Order No. 636 only applies to *inter*state buy/sell agreements, Procter and Gamble fails to acknowledge that no buy/sell agreement, either interstate or intrastate, ever existed between the parties. The only arrangement agreed upon by both parties was that PG & W would provide on an experimental basis four months of its capacity to Procter and Gamble. After those four months ceased, no further capacity allocation was agreed upon.

17. Procter and Gamble also argues that even if the PUC lacks jurisdiction over its proposed agreement, we should find that the PUC erred by failing to consider refunding the higher rates charged by PG & W to Procter and Gamble during the experimental four-month period. However, Procter and Gamble's complaint was severed by the PUC, and the only issues which the PUC heard and were preserved for appeal dealt with the jurisdiction of the PUC, possible discrimination of other customers, and the rates which would be reasonable if the agreement for year-long capacity allocation was approved. Therefore, Procter and Gamble's complaint regarding the costs it incurred for previous service is not before this court.

## ORDER

AND NOW, this 11th day of March, 1993, the order of the Pennsylvania Public Utility Commission, dated March 30, 1992, dismissing the complaint of Procter and Gamble, is affirmed.