**INTERSTATE GAS MARKETING, INC., Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

**PENNSYLVANIA GAS AND WATER COMPANY, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 13, 1996.

Decided June 24, 1996.

Reargument Denied Aug. 23, 1996.

---

James H. Norris, for Petitioner, Interstate Gas Marketing.

Lawrence F. Barth, Assistant Counsel, for Respondent.

Before COLINS, President Judge, and DOYLE, McGINLEY, PELLEGRINI, FRIEDMAN, KELLEY and FLAHERTY, JJ.

FRIEDMAN, Judge.

Pennsylvania Gas and Water Company (PG&W) and Interstate Gas Marketing, Inc. (IGM) cross-appeal from a Pennsylvania Public Utility Commission (PUC) order denying the parties' Exceptions and adopting, with modifications, the Recommended Decision of an Administrative Law Judge (ALJ) to allow PG&W to implement its proposed Tariff Supplements.

On May 11, 1994, PG&W filed Tariff Supplements with the PUC proposing Market Sensitive Sales Service (MSSS) rates. The MSSS offering would allow PG&W's customers to purchase natural gas supplies at market sensitive prices and to transport those supplies from the wellhead to PG&W's city gate through the use of PG&W's interstate pipeline capacity.[1] (PUC's op. at 1.)

On or about July 6, 1994, IGM filed a formal complaint against PG&W's proposed

---

1. PG&W's proposed Tariff Supplements describe the MSSS rate as follows:

[MSSS] is available in conjunction with [PG&W's] gas transportation services ... [and] will be provided at the sole discretion of [PG&W] by utilizing its interstate pipeline capacity to deliver gas supplies to [PG&W's] interstate pipeline delivery points (City Gates). These gas supplies will be delivered from the City Gates to the customer under the terms and conditions of the applicable transportation service(s).

(R.R. at 93a, 100a, 106a, 113a.) In *Procter & Gamble Paper Products v. Pennsylvania Public Utility Commission*, 154 Pa.Cmwlth. 190, 623

A.2d 410, 414, *appeal denied*, 535 Pa. 627, 629 A.2d 1386 (1993), this court provided the following background with respect to the natural gas industry:

The natural gas industry is primarily divided into three segments: [1] the production of natural gas at wells scattered throughout the country, [2] the shipment of the gas by transmission companies via interstate pipelines to LDCs [Local Distributing Companies], and [3] the removal of natural gas from pipelines by LDCs for sale to customers or end users. In order for an LDC to receive gas to sell to its end users, it purchases capacity on an interstate or intrastate pipeline from the transmission companies. This capacity is also referred

Tariff Supplements. In its complaint, IGM averred, *inter alia*, that: (1) PG&W is a public utility which provides natural gas service; (2) IGM markets natural gas to approximately 150 natural gas users who are also customers of PG&W;[2] (3) PG&W's gas transportation rates and regulations have a direct impact upon PG&W's customers' operating costs; and (4) the proposed MSSS rate would impermissibly discriminate against certain PG&W customers represented by IGM in violation of section 1304 of the Public Utility Code.[3] (IGM's Complaint, paras. 3–5 and 9; R.R. at 7a–9a.)

PG&W filed a timely answer and new matter, (R.R. at 13a–21a), and a motion to dismiss IGM's complaint for lack of standing,

(R.R. at 22a–27a). IGM filed a timely answer to PG&W's motion to dismiss, (R.R. at 29a–40a), and a reply to PG&W's new matter, (R.R. at 41a–47a).

Following a prehearing conference, hearings were held before the ALJ. At the hearings, the ALJ denied PG&W's motion to dismiss IGM's complaint for lack of standing.[4] IGM then argued, *inter alia*, that PG&W's proposed MSSS rates are contrary to Federal Energy Regulatory Commission (FERC) guidelines relating to the release of pipeline capacity. (R.R. at 62a.) Specifically, IGM contended that the PG&W's Tariff Supplements violate FERC Order 636.[5]

The ALJ considered the evidence presented at the hearings and issued a Recom-

---

to as "transportation" services. The purchase of capacity ensures that the LDC is allocated a certain percentage of the capacity of the pipeline to transport gas to provide sufficient gas to its customers.

2. IGM produced evidence to show that those 150 customers had authorized IGM to act as their agent for the acquisition and delivery of natural gas from PG&W. (R.R. at 39a.)

3. Section 1304 of the Public Utility Code, 66 Pa.C.S. § 1304, states in pertinent part:

No public utility shall, as to rates, make or grant any unreasonable preference or advantage to any person ..., or subject any person ... to any unreasonable prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates, either as between localities or as between classes of service.

4. Thereupon, PG&W filed a Petition for Interlocutory Review with the PUC, which denied the petition without addressing the merits. (R.R. at 48a–56a.)

5. The provisions of FERC Order 636 can be found at 18 C.F.R. § 284.243 (emphasis added), which states in pertinent part:

(a) An interstate pipeline that offers transportation *service on a firm basis* ... must include in its tariff a mechanism for *firm shippers to release firm capacity to the pipeline for resale by the pipeline on a firm basis under this section.*

(b) Firm shippers must be permitted to release their capacity, in whole or in part, on a permanent or short-term basis, without restriction on the terms or conditions of the release. *A firm shipper may arrange for a replacement shipper to obtain its released capacity from the*

*pipeline.* A replacement shipper is any shipper that obtains released capacity.

(c) Except as provided in paragraph (h) of this Section, a firm shipper that wants to release any or all of its firm capacity must notify the pipeline of the terms and conditions under which the shipper will release its capacity. *The firm shipper must also notify the pipeline of any replacement shipper designated to obtain the released capacity under the terms and conditions specified by the firm shipper.*

(d) The *pipeline must provide notice* of offers to release or to purchase capacity, the terms and conditions of such offers, and the name of any replacement shipper designated in paragraph (b) of this section, *on an electronic bulletin board,* for a reasonable period.

(e) The pipeline must allocate released capacity to the person offering the highest rate (not over the maximum rate) and offering to meet any other terms and conditions of the release. If more than one person offers the highest rate and meets the terms and conditions of the release, the released capacity may be allocated on a basis provided in the pipeline's tariff, provided, however, *if the replacement shipper designated in paragraph (b) of this section offers the highest rate, the capacity must be allocated to the designated replacement shipper.*

....

(h)(1) A release of capacity by a firm shipper to a replacement shipper for any period of less than one calendar month need not comply with the notification and bidding requirements of paragraphs (c) through (e) of this section. "Service on a firm basis" means that the service is not subject to a prior claim by another customer or another class of service; the service receives the same priority as any other class of firm service. 18 C.F.R. § 284.8(a)(3).

Here, PG&W is a "firm shipper" on two interstate pipelines, Tennessee Gas Pipeline Corporation and Transcontinental Gas Transmission Corporation. (R.R. at 66a.)

mended Decision, wherein the ALJ concluded, *inter alia*, that IGM has standing to participate in the proceeding, and that PG&W's Tariff Supplements were not fundamentally illegal, i.e., the MSSS offering did not violate FERC Order 636. (R.R. at 78a.) Thus, the ALJ recommended that the PUC should allow PG&W's Tariff Supplements to become effective, subject to certain revisions.

PG&W and IGM filed Exceptions to the ALJ's Recommended Decision. PG&W objected to the ALJ's conclusion that IGM had standing in this matter; IGM challenged, *inter alia*, the ALJ's conclusion that PG&W's Tariff Supplements did not violate FERC Order 636. Each then filed a Reply to the other's Exceptions. The PUC denied IGM's Exceptions, denied PG&W's Exceptions in part and adopted the ALJ's decision with modifications.

## I. Standing

■ On appeal to this court,[6] PG & W argues that IGM lacked standing before the PUC and, moreover, lacks standing before this court.[7] We disagree.

Section 701 of the Public Utility Code, 66 Pa.C.S. § 701 (emphasis added), provides:

> [A]ny ... corporation ... *having an interest in the subject matter [of a PUC proceeding]* ... may complain in writing, setting forth any act or thing done ... by any public utility in violation, or claimed violation, of any law which the [PUC] has juris-

diction to administer, or of any regulation or order of the [PUC].

Moreover, 52 Pa.Code § 5.21(a) (emphasis added) states:

> (a) A person[8] complaining of an act done ... by a person subject to the jurisdiction of the [PUC], in violation, or claimed violation of a statute which the [PUC] has jurisdiction to administer, or of a regulation or order of the [PUC], *may file a formal complaint* with the [PUC].

Here, pursuant to the statute and regulation, IGM filed a formal complaint against PG&W on behalf of its 150 customers who are also customers of PG&W, alleging that PG&W's proposed MSSS rate will adversely affect the customers' operating costs and will permit impermissible discrimination against some of those customers in violation of section 1304 of the Public Utility Code. Like the PUC, we believe that IGM, as agent for its customers, had an interest in PG&W's proposal and, thus, had standing to file its formal complaint with the PUC.

■ Addressing whether IGM now has standing before this court, we initially note that IGM's interest in PG&W's Tariff Supplements made IGM a "party" in the proceeding before the PUC. Indeed, under 52 Pa.Code § 1.8 (emphasis added), a "party" is "[a] person [with] a *direct interest* in the subject matter of the proceeding."[9] An interest is "direct" where the subject matter

---

6. Our scope of review of a PUC order is limited to a determination of whether constitutional rights have been violated, an error of law has been committed, or the findings or order of the PUC are not supported by substantial evidence. *Middletown Township v. Pennsylvania Public Utility Commission*, 85 Pa.Cmwlth. 191, 482 A.2d 674 (1984).

7. The PUC joins PG&W in its argument that IGM lacks standing to appeal the PUC decision to this court.

8. The term "person" includes corporations. 52 Pa.Code § 1.8.

9. In defending its position that IGM had standing before the PUC but lacks standing before this court, the PUC cites *Arsenal Board of Trade v.*

*Pennsylvania Public Utility Commission*, 166 Pa.Superior Ct. 548, 72 A.2d 612 (1950), for the proposition that the principles governing the question of standing before an administrative agency are somehow different from the principles which govern standing for judicial review of the final order of an administrative agency. We believe that the PUC has misconstrued *Arsenal Board of Trade*.

In *Arsenal Board of Trade*, our superior court held that Arsenal Board of Trade lacked standing to appeal from a PUC order to the superior court. The court stated that "[e]very person who files a protest in a proceeding pending before the [PUC] ... is not ipso facto a *party* to the proceedings with a right to maintain an appeal from the [PUC's] order." *Arsenal Board of Trade*, 166 Pa.Superior Ct. at 551–52, 72 A.2d at 614 (emphasis added). Indeed, in that case, although

causes harm to the interest. *Wm. Penn Parking Garage v. Pittsburgh,* 464 Pa. 168, 346 A.2d 269 (1975). Here, IGM alleges that the proposed MSSS rate will cause harm to certain PG&W customers represented by IGM. Thus, IGM is a "party" with a direct interest in this case.

■ Section 702 of the Administrative Agency Law, 2 Pa.C.S. § 702 (emphasis added), provides:

> Any person *aggrieved* by an adjudication of a Commonwealth agency *who has a direct interest* in such adjudication shall have the right to appeal therefrom to the court vested with jurisdiction of such appeals by or pursuant to Title 42 (relating to judiciary and judicial procedure).

Furthermore, Pennsylvania Rules of Appellate Procedure 501, Pa. R.A.P. 501 (emphasis added), provides:

> Except where the right of appeal is enlarged by statute, any *party* who is *ag-grieved* by an appealable order ... may appeal therefrom.

In order to be "aggrieved," a party must have a direct, substantial and immediate interest in the subject matter of the litigation.[10] *Pennsylvania Petroleum Association v. Pennsylvania Power & Light Co.,* 32 Pa. Cmwlth. 19, 377 A.2d 1270 (1977), *aff'd,* 488 Pa. 308, 412 A.2d 522 (1980) (citing *Wm. Penn Parking Garage* ).

Again, IGM represents certain PG&W customers; indeed, IGM is the authorized agent for those customers in their dealings with PG&W for the acquisition and delivery of natural gas.[11] Because PG&W's MSSS rate could immediately affect the operating costs of some of those customers or result in impermissible discrimination against some of them, we believe that IGM has a direct, substantial and immediate interest in the proposed MSSS rate. Thus, IGM, as agent for certain customers of PG&W, is an ag-

---

representatives of Arsenal Board of Trade testified in their individual capacities before the PUC, Arsenal Board of Trade itself was never a party, an intervenor or even a participant in the proceeding before the PUC.

We note that PUC regulations distinguish between a party, an intervenor and a participant. Whereas a "party" has a direct interest in the proceeding, a "participant" is a person admitted by the PUC to limited participation in a proceeding. 52 Pa.Code § 1.8. Moreover, "[a]dmission as an intervenor will not be construed as recognition by the [PUC] that the intervenor has a direct interest in the proceeding or might be aggrieved by an order of the PUC in the proceeding." 52 Pa.Code § 5.75(b). Here, the PUC admits that IGM was a "party" to the proceeding.

10. As stated above, the requirement that an interest be "direct" simply means that the subject matter causes harm to the interest. The remaining requirements, i.e., that the interest be "immediate" and "substantial," are concerned with the nature of the causal connection between the subject matter and the harm. Generally speaking, the possibility that an interest will suffice to confer standing decreases as the causal connection grows more remote. *Wm. Penn Parking Garage.*

11. Thus, this case is distinguishable from *Pennsylvania Petroleum Association,* where Pennsylvania Power & Light Company (PP&L) filed tariff supplements with the PUC requesting new rates.

The Pennsylvania Petroleum Association (PPA) filed a complaint wherein PPA described itself as a non-profit statewide trade association with many members who are *competitors* of PP&L. Because competitors only have standing where the alleged competition is prohibited by a regulatory scheme in which both parties participate, and because there was no such regulatory scheme in *Pennsylvania Petroleum Association,* we concluded that PPA did not have standing to appeal the PUC order.

In reaching that result, we noted that PPA alleged in its petition for review that some of its members were also *customers* of PP&L. However, because PPA failed to make that allegation in its original complaint and failed to identify which members were customers during its presentation, we refused to consider PPA's standing in that light.

Here, IGM alleged in its original complaint that it represented *customers* of PG&W. We realize that IGM would not identify those customers because it considered such to be "proprietary business information," and because it believed that making "a complete list of its customers part of the public record would irreparably harm IGM." (R.R. at 31a.) However, IGM offered to provide such a customer list upon the entry of an appropriate protective order by the PUC. (R.R. at 31a.) We will not penalize IGM here because the PUC granted standing without issuing the protective order and receiving into evidence a customer list.

grieved party with standing to take an appeal from the PUC decision to this court.[12] Accordingly, we affirm that part of the PUC order.

## II.

■ Having determined that IGM has standing to appeal from the PUC order to this court, we turn to the issue raised by IGM, i.e., whether the PUC erred in concluding that FERC Order 636 is not applicable here and, therefore, does not preempt PG&W's Tariff Supplements. We agree with IGM that the PUC erred in this regard.

This court has stated that the FERC has jurisdiction over all agreements dealing with *interstate* gas transportation pursuant to section 1(b) of the Natural Gas Act (NGA).[13] *Procter & Gamble Paper Products.* Because the proposed MSSS rate involves an agreement for the use of *interstate* pipeline capacity for the transportation of natural gas, FERC Order 636 applies here.[14]

■ Having determined that the federal law applies here, we must now decide whether PG&W's Tariff Supplements are preempted by FERC Order 636. Where, as here, Congress has not entirely displaced state regulation in a particular field, state law is pre-empted when it actually conflicts with federal law. *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988). Such a conflict will be found when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress. *Id.*

The FERC issued Order 636 to place gas purchasers on an equal footing and to place *all* interstate transportation transactions under *one* non-discriminatory program. *Procter & Gamble Paper Products.* To meet this end, FERC Order 636 instituted a "capacity releasing program," under which an LDC's unwanted interstate pipeline capacity would be made available to others seeking such capacity by releasing the excess capacity to the *open market* so that other LDCs and end users would have *an equal chance to bid* for the released capacity. *Id.*

PG&W's proposed MSSS rate states that interstate pipeline capacity will be provided "at the sole discretion of [PG&W]." We believe that such language manifests a clear intent to by-pass the non-discrimination requirements of FERC Order 636, i.e., that all LDC's and end users have an opportunity to bid on the open market for unwanted or excess interstate pipeline capacity. Indeed, it is clear to us that PG&W's proposed MSSS rate is an obstacle to the non-discriminatory policy of federal law. Because of this conflict between PG&W's Tariff Supplements and FERC Order 636, we conclude that FERC Order 636 preempts PG&W's proposed Tariff Supplements.

Accordingly, we reverse that portion of the PUC order.

12. We reject the PUC's argument that IGM, in justifying its standing here, focuses primarily on its status as a competitor of PG&W. We have examined all of IGM's briefs and note that IGM consistently argues on behalf of its customers.

13. Section 1(b) of the NGA, 15 U.S.C. § 717(b), states that the provisions of that particular chapter of the NGA apply to the transportation of natural gas in *interstate* commerce. *Procter & Gamble Paper Products.*

14. The PUC determined that FERC Order 636 did not apply here because the proposed MSSS rate did not involve a "release" of PG&W's interstate capacity. 18 C.F.R. § 284.243(a) (emphasis added) provides in pertinent part as follows:
   (a) An interstate pipeline that offers transportation service on a firm basis ... must include

in its tariff a mechanism for firm shippers to *release firm capacity* to the pipeline *for resale by the pipeline on a firm basis* under this section.
The PUC's position thus appears to be that FERC Order 636 does not apply here because PG&W's proposed Tariff Supplements do not provide for the *release of firm capacity to the pipeline for resale by the pipeline on a firm basis under 18 C.F.R. § 284.243.* In other words, FERC Order 636 does not apply because PG&W's proposed Tariff Supplements fail to comply with FERC Order 636. We are not persuaded by this reasoning.

## ORDER

AND NOW, this 24th day of June, 1996, the order of the Pennsylvania Public Utility Commission, dated January 11, 1995, is affirmed in part and reversed in part.

KELLEY, Judge, dissenting.

I respectfully dissent. As correctly noted by the PUC, IGM is clearly neither a customer of PG&W nor a competitor subject to the PUC's regulation; therefore, IGM cannot establish standing on either of those two grounds. Despite this acknowledgement, the PUC determined that IGM had standing based on its alleged representation of PG&W customers. However, IGM never identified what PG&W customers it was allegedly representing.

I recognize that IGM offered to place into evidence a customer list if the PUC issued a protective order. Notwithstanding the fact that the PUC granted standing without requiring a customer list, I believe that IGM was required to produce a list of PG&W customers that it was representing and how those customers' interests would be harmed in order to alleviate the ramifications of IGM's obvious competitive interest. If the PUC and this court are going to grant standing to a non-regulated competitor and noncustomer of a regulated utility in a tariff proceeding, I believe that it is incumbent that the interest to which the non-regulated competitor is claiming bestows standing must be adequately disclosed on the record. To permit otherwise will only result in more competitor's being granted standing based on bare allegations of representative status where the non-regulated competitor's only real interest is preserving its competitive status. This certainly does not qualify as a direct, substantial interest and is nothing more than a remote consequence of the PUC's order. *Pennsylvania Petroleum Association.*

Accordingly, I would hold that the IGM did not have standing before the PUC and dismiss its appeal of the PUC's order.