**ENERGY CONSERVATION COUNCIL OF PENNSYLVANIA, Petitioner**

v.

**PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 7, 2009.

Decided May 6, 2010.

Reargument Denied June 30, 2010.

467

Willard R. Burns, Marianna, for petitioner.

Patricia T. Wiedt, Asst. Counsel, Harrisburg, for respondent.

Alan Michael Seltzer, Wyomissing, for intervenor.

BEFORE: COHN JUBELIRER, Judge, and LEAVITT, Judge, and QUIGLEY, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

Energy Conservation Council of Pennsylvania (ECC) petitions for review of that portion of the order of the Pennsylvania Public Utility Commission (PUC), which, in relevant part: (1) granted the Trans–Allegheny Interstate Line Company (TrAIL Co.) a Certificate of Public Convenience with respect to its Pennsylvania 502 Junction Facilities (502 Facilities), subject to certain conditions; and (2) granted TrAIL Co. authorization and certification to locate, construct, and operate the 502 Facilities, subject to certain conditions. On appeal, ECC argues that the PUC's determination must be reversed because: (1) TrAIL Co.'s applications for a Certificate for Public Convenience and authority to locate, construct, and operate the 502 Facilities (Applications) allegedly did not comply with the siting criteria set forth in the PUC's regulations; and (2) the PUC

erred in finding a public need for the 502 Facilities.[1] The PUC argues, preliminarily, that ECC's appeal should be dismissed because ECC is not aggrieved and, therefore, lacks standing to bring this petition for review. The PUC also argues that it properly granted the Applications.

## I. Background

In May 2005, PJM Interconnection, L.L.C. (PJM), the regional transmission operator charged with managing the electric utilities transmission systems in thirteen states (PJM Region), including, among others, Pennsylvania, Virginia, West Virginia, and the District of Columbia, announced the Project Mountaineer concept. PJM described Project Mountaineer as an approach through which PJM could identify a comprehensive plan to increase the transfer of electricity from the western part of the PJM Region to the eastern part of the PJM Region. Thereafter, Allegheny Energy, Inc. (Allegheny), TrAIL Co.'s parent corporation, submitted a proposal outlining its Trans–Allegheny Interstate Line Project (TrAIL Project), which involved 330 miles of kilovolt (kV) capacity transmission lines, including the 502 Facilities, as a possible solution for Project Mountaineer objectives. In March 2006, Allegheny recommended the TrAIL Project as a solution to reliability issues in certain parts of the PJM Region. In May 2006, PJM proposed a 5–year regional transmission expansion plan (2006 RTEP) designed to ensure the reliability of the electric transmission grid in the PJM Region and which included a modified version of the TrAIL Project. PJM approved the 2006 RTEP in June 2006.

On April 13, 2007, TrAIL Co. filed five applications, including: (1) an application for a Certificate of Public Convenience to offer, render, furnish, or supply electrical transmission service in Pennsylvania; and (2) an application for authorization to locate, construct, operate, and maintain the 502 Facilities in Greene County, southwestern Pennsylvania.[2] The 502 Facilities are a part of the TrAIL Project and consist of one 500–kV, high voltage (HV) transmission line (502 Segment) and a new 500–kV substation (502 Substation) in Greene County. The 502 Segment would run from the 502 Substation to the Pennsylvania–West Virginia border, 1.2 miles south, and would continue for 240 miles across West Virginia and Virginia. ECC, among others, intervened in opposition to TrAIL Co.'s Applications.

## II. Hearings before the Administrative Law Judges

The matter was assigned to two Administrative Law Judges (ALJs), who held multiple public hearings and comment sessions, viewed the locations of the 502 Facilities, accepted both live testimony and deposition testimony, and admitted thousands of pages of documentary evidence into the record prior to issuing a recommended decision (RD). In the RD, the ALJs addressed each Application separately and, ultimately, found that TrAIL Co. failed to carry its burden of proof on any of its Applications. Therefore, the ALJs' RD was that the PUC should deny the Applications. Because ECC appeals only the grant of the certificate of public convenience and the application to site and construct the 502 Facilities, this Court will only address those two Applications.

1. A joint amicus curiae brief in support of ECC was filed by Sierra Club, Union of Concerned Scientists, National Audubon Society, Inc., Group Against Smog and Pollution, Inc., and Piedmont Environmental Council.

2. The Applications included a second project, the Prexy Facilities; however, that matter is not before our Court in this appeal.

With regard to its Application for a Certificate of Public Convenience, TrAIL Co. submitted evidence that there was a public need for the 502 Facilities as demonstrated by the 2006 RTEP. The 2006 RTEP revealed that there would be numerous North American Electric Reliability Council (NERC) reliability criteria violations within the PJM Region beginning in 2011 and that the 502 Facilities, in conjunction with the rest of the TrAIL Project, would resolve those reliability violations. TrAIL Co. witnesses testified that reliability issues in the transmission line in other states could result in reliability issues for electric customers in south central Pennsylvania. According to TrAIL Co.'s witnesses, the 502 Facilities, as a part of the TrAIL Project, were the most viable and cost-effective solution to the documented reliability problems in the PJM Region, and the alternatives proposed by ECC and the other objectors were neither feasible, nor viable. Thus, TrAIL Co. asserted that there was a public need for the 502 Facilities to ensure the reliability of the regional transmission system and services for Pennsylvania customers.

ECC argued that the TrAIL Project was not driven by reliability, but by economics. ECC and the other objectors presented evidence that the TrAIL Project, including the 502 Facilities, was not necessary to improve reliability concerns. ECC's witnesses attacked the validity of

the 2006 RTEP and questioned whether there truly were any reliability problems in the PJM Region. Nevertheless, ECC and other objectors presented the testimony of their own experts that there were other ways to improve the reliability of the transmission lines in the PJM Region by, *inter alia,* increasing ground clearance or retensioning and reconductoring the transmission lines.

The ALJs found that there was no public need for the 502 Facilities pursuant to Section 1501 of the Public Utility Code (Code), 66 Pa.C.S. § 1501,[3] Section 57.76 of the PUC's regulations, 52 Pa.Code § 57.76, and this Court's decision in *Pennsylvania Power & Light Co. v. Pennsylvania Public Utility Commission,* 696 A.2d 248, 250 (Pa.Cmwlth.1997) (*PP & L*).[4] (RD at 79–80.) The ALJs held that there is no public need in Greene County for the 502 Facilities and that TrAIL Co. does not claim that such need exists in Greene County. (RD at 110.) Further, the ALJs concluded that TrAIL Co. failed to meet its burden of proof for the 502 Facilities because, among other things: (1) the TrAIL Project, including the 502 Facilities, was driven by economics, not reliability problems with the PJM Region; (2) the costs and adverse impacts of the TrAIL Project clearly outweigh the benefits; (3) the RTEP process, used to identify reliability problems and the need for the 502 Facili-

---

3. Section 1501 of the Code, states, in relevant part:

> Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public.

66 Pa.C.S. § 1501.

4. In *PP & L*, we stated that Section 1501, in pertinent part, requires that every utility make improvements "as shall be necessary or proper for the accommodation, convenience and safety of its patrons, employees and the public" and that the PUC, prior to granting approval of an application, consider that the proposed transmission line will have a minimum adverse environmental impact "considering the electric power needs of the public, the state of the available technology and the available alternatives." *PP & L*, 696 A.2d at 250.

ties, was overly conservative and was designed to yield only solutions involving increases in transmission capacity; and (4) TrAIL Co. failed to consider any non-transmission alternatives for resolving the reliability issues. (RD at 111–16.)

With regard to its Application for approval to locate, construct, operate, and maintain the 502 Facilities, TrAIL Co. submitted its Line Route Evaluation Report (LRE Report) and testimony to support its selected 1.2-mile route. TrAIL Co. asserted that its route selection process was consistent with current siting methods and Pennsylvania law. TrAIL Co. pointed out that its criteria for the route selection process was to, *inter alia*, maximize the separation distance from residents and avoid residential developments outside of Morgantown, West Virginia. TrAIL Co. offered testimony that the route chosen, Route H, was the shortest and most direct of the alternatives, crossed only one small stream, crossed no wetlands, and required only slightly more than one mile of forest to be cleared. (TrAIL Co.. Statement 5 at 6, 15; Reproduced Record (R.R.) at 175a, 184a.) The testimony also revealed that there were only two residences within 500 feet of the centerline and that there were no historic (architectural) sites within a quarter mile of the route. (TrAIL Co. Statement 5 at 6, 15; R.R. at 175a, 184a.) TrAIL Co. further asserted that the siting regulations do not impose a "no impact" standard, but require the applicant to show that it took reasonable steps to minimize environmental impact, which it did as evidenced by the facts noted above.

ECC asserted that the analysis TrAIL Co. submitted in support of its preferred route, Route H, did not adequately describe and distinguish the alternative routes. Additionally, ECC argued that the LRE Report failed to conduct a true environmental impact analysis of the proposed routes and that TrAIL Co.'s Application failed to address numerous environmental and cultural impacts of the preferred route. ECC asserted that TrAIL Co. must provide an analysis of these impacts before the PUC grants approval for the siting of the 502 Facilities.

The ALJs concluded that TrAIL Co.'s siting process did not meet the PUC's siting regulations and could not support a finding that Route H was reasonable for the 502 Facilities. (RD at 169, 176–177.) The ALJs agreed with ECC and the objectors regarding TrAIL Co.'s efforts to minimize the environmental impact of the proposed project. Thus, the ALJs concluded that TrAIL Co. failed to satisfy its burden of proof that it acted responsibly and reasonably to mitigate the environmental impact of the proposed project. (RD at 189–90.)

### III. Appeal to the PUC

TrAIL Co. filed eleven exceptions to the ALJs' determination with regard to the 502 Facilities, six of which are relevant to ECC's present petition for review to this Court.[5] ECC, among other objectors, filed reply exceptions to the RD. The PUC considered each exception in turn.

In exceptions two through five, TrAIL Co. challenged the ALJs' determination that there was no public need for the 502 Facilities, arguing that the ALJs: (1)

failed to consider regional reliability issues pursuant to Section 2805(a) of the Code, 66 Pa.C.S. § 2805(a); (2) failed to give proper weight to the evidence that the TrAIL Project was designed as a direct response to documented reliability problems and not motivated by economic needs; (3) erroneously found that TrAIL Co. and PJM did not consider alternatives to the TrAIL Project; and (4) erred in holding that the 502 Facilities would negatively impact the development of generation facilities in the eastern PJM Region. (TrAIL Co. Exceptions at 4–20; R.R. at 1638a–53a.)

In response, ECC contended that the ALJs considered the regional reliability concerns, but found that TrAIL Co. failed to establish any NERC violations or prove that a regional, interstate reliability issue existed sufficient to justify the 502 Facilities. ECC asserted that the ALJs' finding that the TrAIL Project was economically motivated was supported by the record. ECC next argued that the 2006 RTEP, and the RTEP process in general, clearly contemplates only those solutions involving increased transmission capacity by constructing additional transmission lines, and that the record shows that no non-transmission solutions, such as improving ground clearance around the existing transmission lines, retensioning or reconductoring the existing lines, or reducing energy demand, were considered. Finally, ECC contended that the entire TrAIL Project would result in incentives for generators to build generating facilities in the western PJM Region, rather than in the eastern PJM Region, because ratepayers would essentially subsidize the western generators by paying for the TrAIL Project.

In its opinion, the PUC was persuaded by the 2006 RTEP and TrAIL Co.'s supporting testimony detailing the system stress modeling and projections relating to the twelve future NERC standard violations. (PUC Op. at 34 (citing TrAIL Co. Ex. SWG–1, R.R. at 165a).) The PUC held that it:

> has an obligation to enhance regional reliability and mitigate transmission constraints in order to reduce congestion for ratepayers in Pennsylvania and adjacent jurisdictions. 66 Pa.C.S. § 2805. In our view, the record is clear that the Mount Storm to Doubs line is heavily congested and that alternatives, such as reconductoring, retensioning, or otherwise raising the height of the rights-of-way to improve clearance are likely to impose heavy congestion costs on consumers. Conversely, the record also indicates that the [502 Facilities] will resolve all of the projected overloads in the southern portion of the Allegheny Power [6] transmission zone in a cost-effective and timely manner.

(PUC Op. at 35.) The PUC then stated that it did not disagree with the ALJs' consideration of factors such as whether the TrAIL Project was built to facilitate transmission from the western PJM Region to the eastern PJM Region, and whether greenhouse gas emissions or costs of emissions should be considered. But the PUC noted that, in considering alternatives to the TrAIL Project, "the issue of costs is an important driver, as it should be." (PUC Op. at 36.) The PUC also agreed with the ALJs that economics were a consideration of TrAIL Co. in proposing the 502 Facilities, given that the record established that Project Mountaineer and an earlier version of TrAIL Project were proposed within the context of the west-to-east transfer enhancements. However, the PUC went on to state:

---

**6.** Like TrAIL Co., Allegheny Power is a sub- sidiary of Allegheny.

one cannot easily distinguish between transmission efficiency projects and reliability projects within a congested region. Removing congestion resolves reliability violations, and *vice versa*. There is nothing inherently wrong with removing reliability violations on a heavily congested line through construction of a new transmission line. **Here, we find that the record establishes that the [502 Facilities are] needed to address reliability issues and [are] the best alternative available to achieve that result.** The physical alternatives presented by ECC and discussed by the ALJs approach the problems in a piecemeal manner with no certainty that they will actually resolve the modeled problems. In addition, we agree with TrAIL Co.'s argument that the use of manual system adjustments to alleviate the modeled violations simply invites a host of additional system problems with attendant negative economic impacts.

(PUC Op. at 36 (bold emphasis added).) Accordingly, the PUC found that TrAIL Co. had satisfied its burden of proving a public need for the 502 Facilities, pursuant to Section 1501 of the Code and 52 Pa. Code § 57.76(a)(1), and granted TrAIL Co.'s exceptions two through five.

In its sixth exception, TrAIL Co. asserted that the ALJs erred in failing to find that the route selection process for the 502 Segment was reasonable. TrAIL Co. argued that the selection of the route and proposed rights-of-way (ROW) is a matter for the public utility in the first instance and will not be set aside unless the utility's exercise of its discretionary power is un-

reasonable. TrAIL Co. claimed that its route selection process for the 502 Segment was driven by the necessity of connecting the Pennsylvania portion of the 502 Segment with the West Virginia portion of the 502 Segment and that its selected route, which was the shortest and most direct route, was clearly beneficial to Pennsylvania and all of its residents. (TrAIL Co. Exceptions at 20–21, R.R. at 1653a–54a.) ECC responded that the ALJs properly found the route selection process used by TrAIL Co. unreasonable and incomplete because TrAIL Co.'s Application did not discuss the merits of the route chosen or general descriptions of Routes D–H. Thus, according to ECC, TrAIL Co.'s Application did not satisfy the minimum requirements set forth in 52 Pa. Code § 57.72(c)(10), and the PUC should not have granted the Applications.

The PUC granted TrAIL Co.'s exception to the ALJs' rejection of its route selection for the 502 Segment, stating:

We are persuaded by TrAIL Co.'s assertions that its route selection was driven by routing criteria in adjacent jurisdictions. As repeatedly argued by TrAIL Co., the chosen route is the shortest route given this circumstance. Accordingly, we will grant TrAIL Co.'s exception regarding the route selection. Our grant of this Exception is predicated, in part, on TrAIL Co.'s commitments in its Exceptions, Appendix A, Items 8 and 11....[7]

(PUC Op. at 42–43.)[8]

TrAIL Co. next challenged the ALJs' conclusion that TrAIL Co. did not make

7. In Items 8 and 11, TrAIL Co. agreed to address the safety concerns of owners of metal-roofed structures and tall farm equipment on or near the ROWs for the 502 Facilities by grounding all existing buildings within 50–feet of the edge of the ROW, if the building requires grounding, and to set up a phone

number for the public to contact TrAIL Co. about complaints regarding the 502 Facilities. (TrAIL Co.'s Exceptions, Appendix A, Items 8, 11, R.R. at 1675a.)

8. The PUC instructed TrAIL Co. to provide better alternative route descriptions and dis-

sufficient efforts to minimize the environmental impact of the proposed 502 Facilities. TrAIL Co. asserted that the record evidence showed that the proposed route for the 502 Segment has the least impact on the environment and resources. (TrAIL Co.'s Exceptions at 21–22; R.R. at 1654a–55a.) In response, ECC pointed out that TrAIL Co. failed to address the impact on surface and subsurface waters, despite knowing that the majority of the communities in the surrounding area drew their potable water supplies from such sources.

■■■ The PUC granted TrAIL Co.'s exception, with some conditions. In doing so, the PUC held:

cussions of the merits of the alternative routes in future applications. (PUC Op. at 42–43.)

9. In Item 13, TrAIL Co. agreed to develop a plan to identify ground sources of water, including springs and wells, along the 502 Segment to avoid impacts on those sources, "provided that TrAIL Co.'s implementation of this condition shall be the same as or consistent with existing Allegheny Power practices and procedures." (TrAIL Co.'s Exceptions, Appendix A, Item 13, R.R. at 1676a.) In Item 14, TrAIL Co. agreed to file a report with the PUC evidencing that all required and necessary environmental permits or certificates by other government agencies were obtained prior to beginning construction of the 502 Facilities. (TrAIL Co.'s Exceptions, Appendix A, Item 14, R.R. at 1676a.) In Item 15, TrAIL Co. agreed to file a report with the PUC, prior to commencing construction of the 502 Facilities, establishing the approval and/or acceptance of any required or necessary wetlands delineation, final endangered species study with any mitigation plans, historical/archeological significance study with mitigation plans, and any other required or necessary studies currently underway. (TrAIL Co.'s Exceptions, Appendix A, Item 15, R.R. at 1676a.)

In response to the dissent's assertion that the PUC's order was not final because of the conditions imposed by the PUC, we respectfully disagree. With regard to condition 13, requiring TrAIL Co. to identify sources of ground water, including springs and wells, so

The [PUC] takes its environmental obligations seriously and is very concerned about the lack of information in this Application. However, we are only approving the construction of the 1.2 mile segment known as the [502 Segment]. Because it is only 1.2 miles in length, there will be minimal impact on the environment. For this small segment of the line, we will grant TrAIL-Co's [sic] Exception and find that it has met its burden of proof relating to environmental concerns. Our finding on this issue is, in part, dependent on several commitments made by TrAILCo in Appendix A to its Exceptions, Items 13, 14 and 15 . . . .[9]

as to avoid impacting those sources, we note that the PUC's regulations regarding HV lines, 52 Pa.Code §§ 57.71–57.76, do not require an applicant to identify sources of ground water. The regulation at 52 Pa.Code § 57.75(e) does state that the PUC will accept evidence, and consider, the impact the proposed HV line will have on hydrology and the efforts that have been made *and will be made* to minimize the impact. The regulation does not require zero impact on hydrology and contemplates future efforts to minimize any impact that may occur. Thus, having a condition that says that TrAIL Co. will develop a plan to identify sources of ground water, such as springs and wells, so that they can avoid them is not based on mandatory PUC regulations and would not require further approval or action by the PUC. Condition 14, requiring TrAIL Co. to submit evidence that all required and necessary environmental permits and/or certifications by other governmental agencies have been obtained, does not make the PUC's approval conditional. Rather, it merely requires TrAIL Co. to provide evidence that it obtained those permits and certifications that it is already required to obtain under separate administrative schemes. Finally, with respect to condition 15, which requires TrAIL Co. to provide evidence of the approval and/or acceptance of any required or necessary wetlands delineations, final endangered species study with any mitigation plans, etc., it appears from the PUC's wording of the condition that the ap-

(PUC Op. at 46.) ECC now petitions this Court for review.[10]

## IV. Standing

■ As a threshold matter, the PUC argues that, because ECC is not aggrieved by the PUC's determination, ECC's petition for review should be dismissed for lack of standing pursuant to Pa.R.A.P. 501 (requiring that a party must be aggrieved in order to appeal). The PUC contends that, even though ECC filed a protest and presented evidence before the PUC, it is not automatically a party to the proceedings with a right to appeal the PUC's order. *Arsenal Board of Trade v. Pennsylvania Public Utility Commission,* 166 Pa.Super. 548, 72 A.2d 612, 614–15 (1950). The PUC asserts that ECC is not aggrieved because ECC's protest was to TrAIL Co.'s Applications as a whole, and the record does not reflect any clear or direct interest with regard to the 502 Facilities in particular, which are the subject of the present appeal. The PUC argues that ECC does not have a direct or substantial interest in the PUC's approval of the 502 Facilities because it has not demonstrated any discernable direct or individualized interest that is greater than any other citizen.[11] *See In re Hickson,* 573 Pa. 127, 135, 821 A.2d 1238, 1243 (2003) (stat-

ing that a "substantial interest is an interest in the outcome of the litigation that is greater than any other citizen"). Further, the PUC asserts that ECC's evidence was devoid of specificity and failed to provide specific examples of the environmental effect on individuals. Therefore, the PUC argues that ECC's environmental concerns are not imminent but are potential, future concerns. Finally, the PUC argues that most of ECC's "generic" concerns were "significantly mitigated" by the conditions the PUC imposed on the construction of the 502 Facilities. (PUC's Br. at 16.) We disagree with the PUC that ECC lacks standing.

■ If a party is not adversely affected in any way by the determination being challenged, the party is not aggrieved and, thereby, has no standing to obtain a judicial resolution of the challenge. *William Penn Parking Garage, Inc. v. City of Pittsburgh,* 464 Pa. 168, 192, 346 A.2d 269, 280 (1975). "[I]t is not sufficient for the person claiming to be 'aggrieved' to assert the common interest of all citizens in procuring obedience to the law." *Id.* at 192, 346 A.2d at 280–81. In order to be aggrieved, a party must have a substantial interest in the subject matter of the litigation, the interest must be direct, and the

proval and/or acceptance of these plans or applications does not lie with the PUC, but some other administrative agency. Further, we note that TrAIL Co. submitted evidence that the 502 Segment does not cross any wetlands and that there are no historic sites within a quarter mile of the proposed line. Accordingly, we conclude that the conditions imposed by the PUC do not render the PUC's order interlocutory.

10. On appeal from the granting of a certificate of public convenience by the PUC, this Court's "inquiry is whether [the PUC's] orders granting certificates of public convenience should be vacated or set aside for error of law or lack of supporting evidence or for violation of constitutional rights." *Depart-*

*ment of Environmental Resources v. Public Utility Commission,* 18 Pa.Cmwlth. 558, 335 A.2d 860, 863 (1975).

11. The PUC points out that, according to TrAIL Co.'s exceptions, of the five owners of property that will be directly affected by the construction of the 502 Segment, two have voluntarily signed options for easements in TrAIL Co.'s favor, and TrAIL Co. has agreements in principle for easements across the other three parcels. (PUC Br. at 14 (citing TrAIL Co. Exceptions at 1, R.R. at 1634a).) ECC responds that there is no evidence to support this conclusion where the assertion was made in TrAIL Co.'s exceptions, not in the evidence presented to the ALJs before the record was closed.

interest must be immediate. *Id.* The substantial interest requirement means that "there must be some discernable adverse effect to some interest other than the abstract interest of all citizens in having others comply with the law." *Id.* at 195, 346 A.2d at 282. A direct interest "means that the person claiming to be aggrieved must show causation of the harm to his interest by the matter of which [the person] complains." *Id.* Finally, the interest must "be 'immediate' and 'not a remote consequence of the judgment.'" *Id.* at 197, 346 A.2d at 283 (quoting *Keystone Raceway Corp. v. State Harness Racing Commission,* 405 Pa. 1, 7–8, 173 A.2d 97, 100 (1961)).

■ An association may have standing as a representative of its members. *Tripps Park v. Pennsylvania Public Utility Commission,* 52 Pa.Cmwlth. 317, 415 A.2d 967, 970 (1980). Thus, as long as an organization "has at least one member who has or will suffer a direct, immediate, and substantial injury to an interest as a result of the challenged action[, i.e., is aggrieved, the organization] has standing." *Parents United for Better Schools v. School District of Philadelphia,* 166 Pa.Cmwlth. 462, 646 A.2d 689, 692 (1994) (*PUBS*). For example, in *PUBS,* this Court held that a group of individuals, including parents of high school students, incorporated to challenge the implementation of a new school district policy making condoms available at school-based health clinics upon request of high school students, had standing because at least one of its members would be aggrieved by the school district's actions. *Id.* Similarly, in *Tripps Park,* we held that an organization of Pennsylvania Gas and Water Company customers and ratepayers, had standing "even in the absence of injury to itself ... solely as the representative of its members." *Tripps Park,* 415 A.2d at 970.

A review of ECC's protest (*see* R.R. at 448a–82a), and the list of its members, clearly reveals that ECC has standing to appeal the PUC's determination. ECC has at least sixteen members that are located in and around the area in which the 502 Facilities, including the potentially 200–foot tall 502 Segment, will be located. Nine of ECC's members are located within the proposed ROWs for the 502 Facilities. (TrAIL Co.'s Ex. AJF–1 at 3 (describing the path and ROWs for the 502 Facilities), R.R. at 425a; TrAIL Co.'s Ex. AJF–3 at 1–3 (listing property owners within the ROW, including the nine ECC members), R.R. at 430a–47a.) Further, ECC members testified as to the impacts the siting, construction, operation, and maintenance of the 502 Facilities would have on them, their properties, their businesses, and their communities. (Testimony of various ECC members, R.R. at 1163a–1236a.) Additionally, ECC members include affected ratepayers. The ECC and its members, some of whom own property within the ROWs for the 502 Facilities or are affected ratepayers, have an interest in the PUC's determination that is more than just the interest shared by all citizens to prevent the construction of a HV transmission line. *See Tripps Park,* 415 A.2d at 970 (holding that affected ratepayers are aggrieved). Moreover, the harm alleged by the ECC on behalf of its members, including increased rates and decreased property values, is directly caused by the PUC's approval of TrAIL Co.'s 502 Facilities Applications. Finally, the interests alleged to be harmed, particularly the ratepayer objections given TrAIL Co.'s own evidence showing that the construction and maintenance of the 502 Facilities will result in higher rates for Pennsylvania ratepayers, (ECC's Br. at 22–23), are not a remote consequence of the PUC's judgment. Accordingly, ECC has members that are aggrieved by the PUC's authori-

zation of the 502 Facilities and, consequently, ECC has representative standing to bring this appeal.[12] *PUBS*; *Tripps Park*.

## V. Approval of TrAIL Co.'s HV Transmission Line Applications for the 502 Facilities

### A. Overview of Law Applicable to HV Transmission Line Applications

■ The PUC requires applicants to meet certain regulatory standards before

it will grant approval for HV transmission lines, like the 502 Segment. The PUC's regulations set forth, *inter alia:* (1) the procedures for applying for approval of an HV line—52 Pa.Code § 57.72; (2) the procedures for hearings on HV line applications—52 Pa.Code § 57.75; and (3) what the PUC must consider when deciding whether to approve or deny an HV line application—52 Pa.Code § 57.76(a). These regulations, and 52 Pa.Code § 57.76 in particular, represent a codification of the review required by article I, section 27 of the Pennsylvania Constitution.[13] *Re*

---

12. Moreover, both *Arsenal Board of Trade v. Pennsylvania Public Utility Commission*, 166 Pa.Super. 548, 72 A.2d 612 (1950) and *In re Hickson*, 573 Pa. 127, 821 A.2d 1238 (2003), are distinguishable. In *Arsenal Board of Trade*, the organization asserting standing to appeal never sought to become a party despite its participation in the initial proceedings by introducing evidence. The Superior Court stated, a "party to the proceedings is one who is a party in the legal sense, and who has been made or has become such in some mode prescribed or recognized by the law." *Arsenal Board of Trade*, 72 A.2d at 615. Additionally, the Superior Court held that the organization did not have an interest that was affected by the PUC's approval of certain railroad crossings because the interest asserted, that the "crossing would be a detriment to the Lawrenceville business district," was not immediate or substantial where no members of the organization testified that their businesses would be adversely affected by the proposed crossing. *Id.* at 614–15. Here, unlike the members of the board of trade in *Arsenal Board of Trade*, individual members of ECC testified as to how the approval of the construction of the proposed 502 Facilities would affect them, their property values, and their electricity rates. In fact, this Court has rejected the PUC's assertion that *Arsenal Board of Trade* stands for the proposition that the principles governing standing before an administrative agency are different from the principles governing standing for judicial review of the administrative agency's final order. *Interstate Gas Marketing, Inc. v. Pennsylvania Public Utility Commission*, 679 A.2d 1349, 1354 n. 9 (Pa.Cmwlth.1996).

In *Hickson*, a private attorney filed two private criminal complaints with the Philadelphia District Attorney alleging murder, manslaughter, and related crimes against two state parole agents, who shot and killed a parolee as they attempted to arrest him, after a grand jury concluded that criminal charges against the parole agents were unwarranted. *Hickson*, 573 Pa. at 131–132, 821 A.2d at 1240–41. The District Attorney declined to approve the private criminal complaints, and the private attorney sought appellate review of the denial. *Id.* Ultimately, our Supreme Court held that the private attorney did not have standing where he was neither related to the victim, nor was he acting on behalf of the victim's family, and where the private attorney failed to allege facts that he was personally aggrieved by the victim's death or by the District Attorney's disapproval of the private criminal complaints. *Id.* at 138–140, 821 A.2d at 1245–46. Again, unlike the private attorney in *Hickson*, individual members of ECC testified as to how the approval of the construction of the proposed 502 Facilities would affect them, their property values, and their electricity rates.

13. Article I, section 27 of the Pennsylvania Constitution states:

The people have a right to clean air, pure water and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people. Pa. Const. art. I, § 27.

*Proposed Electric Regulation,* 49 Pa. P.U.C. 709, 712 (1976) (stating that "the review required by article I, section 27 is being incorporated into our siting regulation"). The regulation at 52 Pa.Code § 57.76(a) states, in relevant part, that the PUC will not grant the application, either as proposed or as modified, unless it finds and determines as to the proposed HV line:

(1) That there is a need for it.

(2) That it will not create an unreasonable risk of danger to the health and safety of the public.

(3) That it is in compliance with applicable statutes and regulations, providing for the protection of the natural resources of this Commonwealth.

(4) That it will have minimum adverse environmental impact, considering the electric power needs of the public, the state of available technology and the available alternatives.

52 Pa.Code § 57.76(a). These factors must be proven by a preponderance of the evidence. *Samuel J. Lansberry, Inc. v. Pennsylvania Public Utility Commission,* 134 Pa.Cmwlth. 218, 578 A.2d 600, 602 (1990). A preponderance of the evidence means only that one party has presented evidence that is more convincing, by even the smallest amount, than the evidence presented by the other party. *O'Toole v. Borough of Braddock,* 397 Pa. 562, 564, 155 A.2d 848, 850 (1959).

 We also note that the PUC's interpretations of the Code, the statute for which it has enforcement responsibility, and its own regulations are entitled to great deference and should not be reversed unless clearly erroneous. *Popowsky v. Pennsylvania Public Utility,* 550

Pa. 449, 462, 706 A.2d 1197, 1203 (1997). When reviewing a PUC decision, the Court should neither "substitute its judgment for that of the PUC when substantial evidence supports the PUC's decision on a matter within the commission's expertise," nor should it indulge in the process of weighing evidence and resolving conflicting testimony. *Id.* at 457, 706 A.2d at 1201. "Judicial deference is even more necessary when the statutory scheme is technically complex, as it is in this case." *Id.* at 462, 706 A.2d at 1203.

**B. The Sufficiency of TrAIL Co.'s Applications**

 ECC first argues that TrAIL Co.'s Applications for the 502 Facilities did not satisfy certain criteria set forth in the PUC's regulations at 52 Pa.Code § 57.72(c) and, therefore, the PUC erred in granting TrAIL Co.'s Applications.[14] This regulation provides, in pertinent part:

§ 57.72. Form and content of application.

. . . .

(c) An application shall contain:

. . . .

(7) A description of studies which had been made as to the projected environmental impact of the HV line as proposed and of the efforts which have been and which will be made to minimize the impact of the HV line upon the environment and upon scenic and historic areas. . . .

(8) A description of the efforts of the applicant to locate and identify archaeologic, geologic, historic, scenic or wilderness areas of significance within 2 miles of the proposed right-of-way and the

---

**14.** We have rearranged the order of ECC's arguments for ease of resolution of the issues involved.

location and identity of the areas discovered by the applicant.

. . . .

(10) A general description of reasonable alternative routes to the proposed HV line, including a description of the corridor planning methodology, a comparison of the merits and detriments of each route, and a statement of the reasons for selecting the proposed HV line route.

52 Pa.Code § 57.72(c)(7), (8), and (10).

Paraphrasing this regulation, ECC asserts that an application for an HV transmission line *must:* (1) contain studies of projected environmental impacts of the proposed HV lines, 52 Pa.Code § 57.72(c)(7); (2) identify archeological, geological, historical, scenic or wilderness areas within two miles of the proposed line, 52 Pa.Code § 57.72(c)(8); and (3) provide a description of the reasonable alternative routes for the proposed HV line, including a description of the planning methodology, a comparison of the merits and detriments of the alternatives, and a statement of reasons for choosing the preferred route, 52 Pa.Code § 57.72(c)(10). (ECC's Br. at 60.) According to ECC, TrAIL Co.'s Applications fail to include the necessary information to satisfy these regulatory requirements and are, therefore, procedurally defective. (ECC's Br. at 61.) We disagree.

Contrary to ECC's paraphrasing, subsection (c)(7) does not require that studies actually be performed; rather, it requires that, if those studies have been performed, the applicant must provide a description of the studies. To the extent that the Applications did not include such studies, the PUC issued conditions requiring TrAIL

Co. to perform these studies and report the results to the PUC. The PUC further directed TrAIL Co. to file all of the required environmental permits from state and federal agencies with the PUC prior to the beginning of TrAIL Co.'s construction of the 502 Facilities.[15] (PUC Op. at 46.) Similarly, subsection (c)(8) does not require, as ECC contends, an applicant to identify certain archeologic, historic, scenic, etc. sites within two miles; rather, it requires the applicant to describe the applicant's *efforts* to locate and identify such sites. 52 Pa.Code § 57.72(c)(8). Again, to the extent that the Applications did not satisfy this requirement, the conditions imposed by the PUC require TrAIL Co. to advise the PUC, prior to the beginning of construction of the 502 Facilities, of studies involving these topics along with mitigation plans, where necessary. (PUC Op. at 46.) Accordingly, we conclude that the PUC did not err in finding that TrAIL Co. complied, or will comply, with 52 Pa.Code § 57.72(c)(7) and (c)(8).

 We also conclude that the PUC did not err in approving TrAIL Co.'s Application for route siting pursuant to 52 Pa.Code § 57.72(c)(10). In cases involving challenges to a utility's siting of HV lines for eminent domain or zoning exemption purposes, our courts have held that "it is settled law that the designation of the route for [a HV] line [is] a matter for determination by [a utility's] management in the first instance, and [the utility's] conclusion will be upheld unless shown to be wanton or capricious." *Stone v. Pennsylvania Public Utility Commission,* 192 Pa.Super. 573, 162 A.2d 18, 21 (1960). Thus, where the record establishes that the utility's route selection was reasonable, considering all the factors, its route will be

15. Section 1103(a) of the Code specifically authorizes the PUC, in granting a certificate, to "impose such conditions as it may deem to be just and reasonable." 66 Pa.C.S. § 1103(a).

upheld. *Paxtowne v. Pennsylvania Public Utility Commission,* 40 Pa.Cmwlth. 646, 398 A.2d 254, 256 (1979). The mere existence of an alternative route does not invalidate the utility's judgment. *O'Connor v. Pennsylvania Public Utility Commission,* 136 Pa.Cmwlth. 119, 582 A.2d 427, 433 (1990). This reasoning is equally sound when considering whether a utility has complied with 52 Pa.Code § 57.72(c)(10), as the information required by this section goes towards establishing the reasonableness of the utility's route selection.

Here, TrAIL Co. set forth its evaluation for the proposed routes in the LRE Report, as well as through testimony. The LRE Report identified eight alternative routes ranging from 1.2 miles to 13.4 miles, offers descriptions of the routes, and states that the principal deciding factor was the decision to align the route to the west of Morgantown, West Virginia. (LRE Report at 3, 6, 23, 27–28, 43, R.R. at 197a, 200a, 217a, 221a–22a, 237a.) TrAIL Co.'s witness, Jack Halpern, described the preferred route, indicating, *inter alia,* that it: was the shortest route, at 1.2 miles long; would cross a quarter mile of steep slopes; required only one small stream crossing and would cross no wetlands; and required only slightly more than one mile of forest to be cleared. (TrAIL Co. Statement 5 at 6, 15, R.R. at 175a, 184a.) Mr. Halpern also stated that there were only two residences within 500 feet of the centerline and that there were no historic (architectural) sites within a quarter mile of the route. (TrAIL Co. Statement 5 at 6, 15, R.R. at 175a, 184a.) This evidence clearly supports the PUC's finding that TrAIL Co. considered alternate routes and that the route chosen was reasonable and does not appear to be wanton or capricious. Accordingly, the PUC's decision approving this route is upheld.

## C. Sufficiency of TrAIL Co.'s Environmental Evidence

### 1. Evidence Submitted at the Hearings

ECC next argues that TrAIL Co. failed to introduce the evidence of the environmental impacts of the 502 Facilities as required by 52 Pa.Code § 57.75(e). The regulation at 52 Pa.Code § 57.75(e) outlines what type of evidence the PUC will accept and consider during a hearing on an HV transmission line application. This regulation provides, in relevant part:

(e) At hearings held under this section, the Commission *will accept evidence* upon, and in its determination of the application it *will consider, inter alia,* the following matters:

(1) The present and future necessity of the proposed HV line in furnishing service to the public.

(2) The safety of the proposed HV line.

(3) The *impact and the efforts which have been and will be made to minimize the impact,* if any, of the proposed HV line upon the following:

(i) Land use[;] (ii) Soil and sedimentation[;] (iii) Plant and wildlife habitats[;] (iv) Terrain[;] (v) Hydrology[;] (vi) Landscape[;] (vii) Archeologic areas[;] (viii) Geologic areas[;] (ix) Historic areas[;] (x) Scenic areas[;] (xi) Wilderness areas[;] (xii) Scenic rivers.

(4) The availability of reasonable alternative routes.

52 Pa.Code § 57.75(e) (emphasis added).

ECC argues that this section requires the PUC to *analyze* the environmental impact of the 502 Facilities using the factors set forth in Section 57.75(e)(3), and that TrAIL Co.'s Applications and evidence: failed to include a soil and sedimen-

tation plan; failed to identify locations of private roads; did not detail how TrAIL Co. would protect ground and surface water sources; and did not present a detailed plan on how it would minimize water and air pollution from the construction of the TrAIL Project. On this last point, ECC focuses on the potential pollution that may result from the overall TrAIL Project, and the resulting new coal-fired power plants in the western PJM Region. ECC maintains that the PUC, itself, recognized these deficiencies but, nonetheless, granted the Applications with conditions. ECC contends that the PUC's imposition of conditions does not resolve the inadequacy of the Applications because "it is too late to assess the[ ] environmental impact *after* the specific line route has been chosen." (ECC's Br. at 67 (emphasis in original).) Again, we disagree.

Contrary to ECC's assertions, 52 Pa. Code § 57.75(e) does not require the PUC to analyze the environmental impact of the 502 Facilities. Rather, as correctly asserted by the PUC, it describes the type of evidence that the PUC will accept and consider in deciding whether to grant or deny an HV transmission line application. To the extent that ECC relies upon its own evidence and the ALJs' findings of fact to support its allegations of deficiencies in TrAIL Co.'s Applications and evidence, we note that the PUC is the ultimate fact finder. *See* Section 335(a) of the Code, 66 Pa.C.S. § 335(a) (stating that, after reviewing an administrative law judge's initial decision, the PUC has all the powers which it would have in making the initial decision); *Pennsylvania Power Company v. Pennsylvania Public Utility Commission*, 155 Pa.Cmwlth. 477, 625 A.2d 719, 726 (1993) (holding that "an ALJ's decision may always be overruled based upon contrary findings by the PUC if the PUC's findings are based on substantial evidence"). Moreover, to the ex-

tent that the Applications may not have expressly complied with this section, TrAIL Co. submitted additional evidence that the route selected for the 502 Segment crossed only one small stream, crossed no wetlands, would only cross one quarter mile of steep soils, that there were only two residences within 500 feet of the centerline, and that there were no historic (architectural) sites within one quarter mile of the route. Finally, the PUC imposed numerous conditions requiring TrAIL Co. to perform additional studies and report the results of those studies before beginning construction on the 502 Facilities. Accordingly, we are satisfied that TrAIL Co.'s Applications and evidence, along with the conditions imposed by the PUC, satisfy the requirements of 52 Pa.Code § 57.75(e).

## 2. Sufficiency of the Evidence of Minimum Adverse Environmental Impact

 ECC also contends that the PUC did not and could not assess the environmental impacts that would occur from the construction of the 502 Facilities because of the deficiencies in TrAIL Co.'s Applications and evidence. Therefore, according to ECC, the PUC erred in finding that the 502 Facilities would have a minimum adverse environmental impact as required by 52 Pa.Code § 57.76(a)(4). Moreover, ECC states that the PUC based its finding of minimum adverse environmental impact on the length of the line, 1.2 miles, and neither the Code, nor the regulations create an exception from the siting and construction requirements based on the length of the line. Again, we disagree.

The PUC's finding that the proposed route, Route H, at 1.2 miles, would have a minimum adverse environmental impact, particularly with the conditions the PUC imposed, is supported by substantial evi-

dence. There is substantial evidence in the record indicating that the preferred route was the shortest and most direct route and minimizes the environmental impacts of the 502 Segment. TrAIL Co. submitted evidence that the preferred route would only cross one quarter mile of steep soils, would cross one small stream, would not cross any wetlands, required that only slightly more than one mile of forest would be cleared as a ROW and that, of the eight alternative routes considered ranging from 1.2 miles to 13.4 miles in length, this route was chosen to minimize the effects of Pennsylvania resources and to avoid extensive developments immediately south of Pennsylvania in the Morgantown, West Virginia area. (TrAIL Co. Statement 5 at 6, 14–15, R.R. at 175a, 183a–84a.) Moreover, the regulations do not demand "no impact" by a project; rather, it requires a "minimum" impact. The evidence submitted by TrAIL Co., and credited by the PUC, establishes that the proposed route was the shortest of those considered and was chosen to minimize environmental impacts. Additionally, the conditions the PUC imposed requiring TrAIL Co. to perform additional studies and submit the results of those studies, as well all environmental permits obtained from federal and state government agencies, to the PUC before commencing construction on the 502 Facilities ensure the minimization of the environmental impact of the 502 Segment. Accordingly, we conclude that the PUC did not err in finding that TrAIL Co. has satisfied this requirement.

Moreover, we conclude that it was appropriate for the PUC to consider the length of the 502 Facilities when determining whether the HV line would have minimum adverse environmental impact. The regulation at 52 Pa.Code § 57.72(d)(1)(vi), which is a part of the HV application regulations, provides, in relevant part: "(d)

Letter of notification in lieu of application ... (1) A letter of notification may be filed with the Commission in lieu of the application process set forth in §§ 57.71–57.76 for the following ... (vi) An HV line having a proposed route of 2 miles or less." Under the letter of notification process, the applicant does not have to submit *any* environmental impact studies to obtain approval for an HV transmission line that is less than two miles in length. *See* 52 Pa.Code § 57.72(d)(4) (outlining what a letter of notification must contain). If the PUC approves a letter of notification, the HV line shall be located and constructed without the application process set forth in this subchapter. 52 Pa.Code § 57.72(d)(5). By exempting HV lines of less than two miles in length from the application process, including the requirements of providing information on environmental impacts, this regulation raises the presumption that an HV line less than two miles in length, like the one involved here, has a minimum adverse environmental impact.

### D. Public Need
#### 1. Pennsylvania Constitutional Considerations

■■■■ ECC next asserts that the PUC violated its obligations under article I, section 27 of the Pennsylvania Constitution and 52 Pa.Code § 57.76, which is a codification of Section 27, per *Re Proposed Electric Regulation,* 49 Pa. P.U.C. 709, 712 (1976), by finding that there was a public need for the 502 Facilities based on the NERC criteria reliability violations set forth in the 2006 RTEP. ECC asserts that the 2006 RTEP did not consider any non-transmission alternative solutions before concluding that the TrAIL Project was required to resolve the NERC criteria reliability violations. According to ECC, in order to prove a need for the 502 Facilities pursuant to 52 Pa.Code § 57.76(a)(1),

TrAIL Co. had to demonstrate that it had considered alternatives to the 502 Facilities and that these alternatives would not resolve the reliability problems. In its reply brief, ECC takes issue with TrAIL Co.'s argument that the PUC need only look at the "available alternatives" in the context of the "environmental impact minimization" with respect to the route evaluation and final route selection. ECC contends that this argument raises form over substance and misconstrues the intent of 52 Pa.Code § 57.76(a)(1) to carry out the statutory and constitutional mandate under which the regulation was adopted. Thus, ECC maintains that, because the 2006 RTEP failed to assess any non-transmission alternatives, TrAIL Co. failed to satisfy its burden of proving public need.[16]

■ ECC's allegations of error are based on an incorrect reading of Section 57.76(a)(1), which only requires that there be a need for the proposed HV line. Here, ECC attempts to graft language contained in Section 57.76(a)(4), which includes the phrase "minimum adverse environmental impact," onto Section 57.76(a)(1), which contains no such modifying language. According to ECC's interpretation, this would require the PUC to consider environmental factors when determining whether there is a need for the project, here, the 502 Facilities (not the TrAIL Project as a whole). The rules of statutory construction and interpretation, which

also apply to regulations, *Presock v. Department of Military and Veterans Affairs*, 855 A.2d 928, 931 (Pa.Cmwlth.2004), state that the object of all interpretation is to ascertain and effectuate the intention of the General Assembly or, in this instance, the PUC. Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(a). When the words of the regulation are clear and free from ambiguity, *the letter of it is not to be disregarded under the pretext of pursuing its spirit.* 1 Pa. C.S. § 1921(b). ECC's "form over substance" argument requests the Court to ignore the clear and unambiguous language of Sections 57.76(a)(1) and (4) so that the regulation's spirit may be met. However, as Section 1921(b) of the Statutory Construction Act of 1972 makes clear, such requests should not be entertained. Moreover, the balancing of the environmental impact of the HV lines with the need for the HV lines is to be done as described in Section 57.76(a)(4) *after* the need for the lines has been shown in Section 57.76(a)(1).

In any event, TrAIL Co. presented evidence indicating that non-transmission alternatives to resolve the reliability issues, such as those suggested by ECC, were considered by PJM, but were found to be inadequate to resolve the documented reliability problems. (*See, e.g.,* TrAIL Co. St. 2R at 2–5, R.R. at 905a–08a; TrAIL Co. St. 3RJ at 9–11, R.R. at 1070a–72a; TrAIL

---

16. ECC further argues that the PUC's finding that the alternatives proposed by ECC were not viable improperly shifted the burden of proof to it to demonstrate that the alternatives would, in fact, resolve the reliability issues. TrAIL Co. argues that, although it bears the burden to prove that the 502 Facilities meet the standards of the PUC's regulations, the burden of production is shared. TrAIL Co. asserts that once it produced evidence to meet its *prima facie* case on an issue, such as whether there were feasible alternatives to the 502 Facilities, the burden to produce evidence

of co-equal weight sufficient to refute TrAIL Co.'s evidence shifted to ECC. *Morrissey v. Com. Department of Highways*, 424 Pa. 87, 92, 225 A.2d 895, 897–98 (1967) (holding that the burden of proof remains on the same party but, once that party meets its *prima facie* case, the weight of the evidence involving the credibility or persuasive quality of the evidence produced during a trial may shift from side to side as the trial proceeds). We agree with TrAIL Co. that the burden that shifted here was the burden of production, not the burden of proof.

Co. St. 3R at 8, R.R. at 93a; TrAIL Co. Rejoinder St. 20RJ at 3–6, R.R. at 1092a–95a.) Thus, it is apparent from the record that TrAIL Co. did, in fact, consider alternatives to the TrAIL Project and the 502 Facilities. Accordingly, we reject ECC's assertion that TrAIL Co. had to demonstrate that it examined non-transmission alternatives to the TrAIL Project, as a whole, in order to prove public need for the 502 Facilities.

### 2. Regional Reliability

 ECC next argues that the PUC erred in finding a public need for the 502 Facilities based on the PUC's consideration of regional reliability needs under Section 2805(a) of the Code, 66 Pa.C.S. § 2805(a). In Section 2805(a) of the Code, the General Assembly recognized the impact that the deregulation of the electric utility industry would have on the regions surrounding Pennsylvania and, in that section, addressed regionalism and the need for reciprocity with respect to interstate electric power pools.[17] Section 2805(a) states, in pertinent part:

§ 2805. **Regionalism and reciprocity.** (a) **Other states.**—The [PUC] *shall take all necessary and appropriate steps to encourage interstate power pools* to enhance competition *and to complement industry restructuring on a regional basis.* The Commonwealth, the [PUC] and Pennsylvania electric utilities *shall work with the Federal Government, other states in the region and interstate power pools to accomplish the goals of restructuring and to establish independent system operators or their functional equivalents to operate the transmission system and interstate power pools.*

The [PUC], Pennsylvania electric utilities and all electric suppliers *shall* work with the Federal Government, other states in the region, the *North American Electric Reliability Council* [ (NERC) ] and its regional coordinating councils[, like PJM,] or their successors, interstate power pools, and the independent system operator or its functional equivalent *to ensure the continued provision of adequate, safe and reliable electric service to the citizens and businesses of this Commonwealth.*

66 Pa.C.S. § 2805(a) (emphasis added).

ECC argues that the PUC erred and violated the Pennsylvania Constitution by approving the 502 Facilities based on the PUC's mistaken belief that, under Section 2805(a), it had "an obligation to [enhance regional reliability,] mitigate transmission constraints and reduce congestion for ratepayers in Pennsylvania and adjacent jurisdictions." (ECC's Br. at 32.) ECC contends that this is not the correct standard for finding a public need under the Code and PUC regulations and, therefore, constitutes an error of law. ECC equates the PUC's alleged error here with that found by this Court in *PP & L,* in which we held that the PUC applied an incorrect legal standard in denying an HV transmission line application because the utility failed to prove that there was an "engineering need" for the line. *PP & L,* 696 A.2d at 250.

The PUC did not err or commit an abuse of discretion in finding a public need for the 502 Facilities based on regional reliability factors. The Code does not define need; however, Pennsylvania courts have recognized that there is a need for

---

**17.** Section 2805(a) is found in Chapter 28 of the Code, which deregulated Pennsylvania's electric utility industry. *See* Section 2802 of the Code, 66 Pa.C.S. § 2802 (Announcing the declaration of policy to, *inter alia,* deregulate the electric utility industry to encourage greater competition in the wholesale electric market). Chapter 28 of the Code is known as the Electricity Generation Customer Choice and Competition Act. 66 Pa.C.S. § 2801.

regional electric service reliability and a reliable regional transmission system. *Stone*, 162 A.2d at 19–21; *Dunk v. Pennsylvania Public Utility Commission*, 210 Pa.Super. 183, 232 A.2d 231, 234–35 (1967).[18] Moreover, the General Assembly has recognized the importance of ensuring the reliability of electric transmission systems, including regional transmission systems, and the provision of sufficient electrical power at an affordable rate. For example, Section 2802(12) of the Code states: "[r]eliable electric service is of the *utmost importance* to the health, safety and welfare of the citizens of the Commonwealth. Electric industry restructuring *should ensure the reliability* of the *interconnected* electric system by *maintaining the efficiency of the transmission ... system.*" 66 Pa.C.S. § 2802(12) (emphasis added). Section 2802(20) of the Code provides, *inter alia,* that ensuring the reliability of electric service depends on conscientious maintenance of transmission systems, and that independent system operators and the PUC shall set, through regula-

tions, inspection, maintenance, repair and replacement standards and enforce those standards. 66 Pa.C.S. § 2802(20). Section 2803 of the Code defines "reliability" as:

Includes adequacy and security. As used in this definition, "adequacy" means the *provision* of *sufficient* generation, *transmission* and distribution *capacity* so as to supply the aggregate electric power and *energy requirements of consumers, taking into account scheduled and unscheduled outages of system facilities;* and "security" means designing, maintaining and operating a system so that it can handle emergencies safely while continuing to operate.

66 Pa.C.S. § 2803 (emphasis added). Finally, Section 2805 recognizes the need for the PUC and Pennsylvania utilities to work with generators, transmission companies, and distribution companies in the surrounding region, as well as the Federal Government and its agents to ensure safe and reliable electric service. Accordingly,

---

**18.** In *Stone,* the Superior Court considered an appeal of a landowner from a determination of the PUC granting a utility, the Philadelphia Electric Company (PECO), approval to exercise a right of eminent domain in acquiring a right-of-way across the landowner's farm to construct, operate, and maintain a 220 kV transmission line. *Stone,* 162 A.2d at 19. PECO's proposed transmission line would run from one of its substations in Chester County, Pennsylvania, via its proposed Peach Bottom Generating Station, to a point on the Pennsylvania–Maryland state line, where it would connect to a similar line constructed by the Baltimore Gas and Electric Company. *Id.* The landowner challenged the proposed transmission line, arguing, *inter alia,* that it was not necessary. *Id.* at 20–21. The Superior Court rejected the landowner's argument, stating:

One of the principal considerations of public convenience and necessity is the need for integration of the bulk power transmission systems of [PECO] and Baltimore.... [I]t clearly appears that the interconnec-

tion[, i.e., transmission line,] will enable *both* systems to obtain greater economies of operation. Furthermore, *each system will be able to meet, adequately and safely, its varying and growing load demands, and to maintain constant voltage, frequency stability, and reliability of service.... Last but not least, there is the important element of need for additional power supply routes in the event of a national emergency.*

*Id.* at 21 (emphasis added). In *Dunk,* the Superior Court relied upon the above language from *Stone* to reject the landowners' challenge to a utility's application to exercise eminent domain to locate a transmission line over the landowners' property because some of the transmitted electricity would be used by utility companies outside Pennsylvania. *Dunk,* 232 A.2d at 232, 234–35. The Superior Court held that, notwithstanding the fact that the energy transmitted over the proposed line would be used by other utilities in Pennsylvania and other states, the exercise of eminent domain was proper. *Id.* at 234–35.

we conclude that ensuring the "reliability" of an electrical transmission system, like the PJM Region, is necessary and proper for the accommodation, convenience, and safety of its patrons, employees, and the public.

Moreover, the PUC's interpretation of Section 2805(a) is reasonable and not clearly erroneous. Examining the language used in that section, particularly the repeated use of "shall" in reference to the PUC's obligations, the PUC's interpretation that the section *requires* the PUC to work with NERC and NERC's regional coordinating councils, like PJM, to *ensure* the continued provision of adequate, safe, and *reliable electric service* for the PJM Region is not clearly erroneous. Given the evidence presented by TrAIL Co. that the 502 Facilities will ensure regional reliability and prevent possible negative impacts on citizens in south central Pennsylvania, we defer to the PUC's interpretation of the Code as that interpretation is not clearly erroneous. *Popowsky,* 550 Pa. at 462, 706 A.2d at 1203.

 Finally, the PUC's finding that "the [502 Facilities are] needed to address reliability issues and [are] the best alternative available to achieve that result," (PUC Op. at 36), is supported by substantial evidence. Here, TrAIL Co.'s evidence detailed the system stress modeling and projections relating to twelve projected NERC reliability standard violations for the PJM Region if the TrAIL Project, including the 502 Facilities, is not con-

structed. (TrAIL Co. Statement 4 at 8–10, R.R. at 148a–50a; TrAIL Co. Ex. SWG–1 Chart A, R.R. at 165a; Testimony of Steven Herling, Tr. at 2270–77, R.R. at 1251a–57a.) TrAIL Co.'s evidence established that the consequences of not constructing the 502 Facilities could severely affect Pennsylvania customers, particularly those in south central Pennsylvania, due to the far-reaching affects of the reliability problems caused by load pockets and overloaded lines. (TrAIL Co. St. 2 at 9–10, R.R. at 92a–93a; TrAIL Co. St. 4 at 9–10, 20–21, R.R. at 149a–50a, 160a–61a.) Moreover, TrAIL Co.'s evidence, accepted by the PUC, established that the alternatives suggested by ECC, such as reconductoring and retensioning, address the reliability issues in a piecemeal manner and may not resolve the reliability issues. (Testimony of Steven Herling, Tr. at 2277, R.R. at 1258a.) Conversely, the PUC found that the construction of the 502 Facilities is the best alternative to address the reliability issues demonstrated in the 2006 RTEP. (TrAIL Co. St. 2 at 8–9, R.R. at 91 a–92a; TrAIL Co. St. 4 at 22–24, R.R. at 162a–63a.) [19] Because the PUC's findings regarding the public need for the 502 Facilities are supported by substantial evidence, we affirm the PUC's grant of a Certificate of Public Convenience to TrAIL Co. for the 502 Facilities.

### 3. Congestion

ECC next asserts that the PUC erred in basing its finding of public need for the 502 Facilities on the need to reduce con-

---

**19.** ECC essentially discounts all of this evidence, focusing on its own evidence, which supports the conclusion that the TrAIL Project is not needed to resolve the reliability violations. However, "in a substantial evidence analysis where both parties present evidence, it does not matter that there is evidence in the record which supports a factual finding contrary to that made by the fact-finder, rather, the pertinent inquiry is wheth-

er there is any evidence which supports the fact-finder's factual finding." *Mulberry Market, Inc. v. City of Philadelphia, Board of License and Inspection Review,* 735 A.2d 761, 767 (Pa.Cmwlth.1999). Moreover, to the extent that ECC refers to the ALJs' findings of fact and conclusions, as well as its own evidence, the PUC, not the ALJs, is the ultimate fact finder.

gestion issues, which is an economic concept, rather than on "reliability" issues. For support, ECC points to the testimony of TrAIL Co. witness Steven Herling, who stated that congestion occurs when the lowest cost electric generation cannot provide the requested electricity because of constraints in the system, and more expensive generation has to be used to service the load instead. (ECC's Reply Br. at 11 (citing Steven Herling's testimony, Tr. at 2505, R.R. at 1296a).) ECC contends that "congestion" is not interchangeable with "reliability" and is not a proper basis on which to base a finding of public need. ECC points out that the entire TrAIL Project was proposed before any reliability criteria infractions were identified and, therefore, it is apparent that the TrAIL Project was driven by economics. However, in making its arguments, ECC ignores the fact that the PUC relied on *both* "congestion" issues and documented reliability issues in finding a public need for the 502 Facilities. As previously stated, the PUC's finding of public need for the 502 Facilities based on documented future NERC reliability criteria violations, and the consequences of those violations, is supported by substantial evidence in the record. Thus, even if the PUC erred in considering congestion issues, we affirm the PUC's finding of public need for the 502 Facilities on the reliability grounds.[20]

Accordingly, we affirm.

## ORDER

**NOW,** May 6, 2010, the order of the Pennsylvania Public Utility Commission in the above-captioned matter is hereby **AFFIRMED.**

DISSENTING OPINION by Judge LEAVITT.

Respectfully, I dissent. The Public Utility Commission has adopted regulations that place a significant burden upon a utility that seeks to add yet another high voltage transmission line to Pennsylvania's landscape. I agree with the Vice Chairman, Tyrone J. Christy, that TrAIL Co. did not meet this burden. I also disagree that the Commission's regulations have relaxed the environmental standards for a transmission line less than two miles long. Indeed, a high voltage transmission line degrades the environment whether it is two miles long or two hundred miles long.

By a 3–2 vote, the Commission approved TrAIL Co.'s proposed construction of a new high voltage electric transmission line and an electric substation in Pennsylvania for the stated reason that they will serve a regional, as opposed to a Pennsylvania, need.[1] In doing so, the Commissioners reversed the conclusion of the two administrative law judges assigned to the case that the evidence presented by TrAIL Co. did not demonstrate a need for the project.

---

20. Moreover, it appears that much of the PUC's discussion of congestion costs was related to its discussion of the alternative solutions proposed by ECC for the reliability issues. For example, the PUC stated:
> [i]n our view, the record is clear that the Mount Storm to Doubs line is heavily congested and that *alternatives, such as reconductoring, retensioning, or otherwise raising the height of the [ROW]* to improve clearance are likely to impose heavy congestion costs on consumers. Conversely, the record also indicates that the [502 Facilities] *will resolve all of the projected overloads[,*

*i.e., reliability issues,*] in the southern portion of the Allegheny Power transmission zone in a cost-effective and timely manner. (PUC Op. at 35 (emphasis added).)

1. Vice Chairman Tyrone J. Christy filed a dissenting statement to the Commission's Opinion and Order. Commissioner Wayne E. Gardner filed a statement concurring with the Commission's vote approving the TrAIL Co.'s application on appeal here but dissenting to the Commission's approval of the Greene County settlement agreement.

The ALJs presided over a lengthy hearing at which numerous witnesses and experts testified and extensive reports were examined. TrAIL Co.'s proposal was opposed by numerous intervenors, including ratepayers and people who live near the proposed transmission line; Rep. H. William DeWeese; the Office of Trial Staff; the Office of Consumer Advocate; and Energy Conservation Council of Pennsylvania, the petitioner in this appeal.

The ALJs found that business opportunity, not reliability, was the impetus for TrAIL Co.'s proposal to build a high voltage service transmission line. By way of Pennsylvania, TrAIL Co. seeks to move its relatively inexpensive electrical power in West Virginia to Loudoun County, Virginia, where that power can command a higher price. The ALJs found that TrAIL Co.'s proposal served the company's need for profits but no real consumer or public need. The ALJs rejected TrAIL Co.'s proffered justification for the construction of a new transmission line in Pennsylvania, i.e., to secure reliability in the grid and to ease congestion in the eastern part of PJM's region, as unfounded.[2]

For example, the ALJs criticized the computer models used to develop PJM's regional transmission expansion plan (Regional Plan) which TrAIL Co. used as its central evidence in support of its claim that the project was needed to resolve future reliability problems.[3] The ALJs found the models to be based upon "an overly conservative, belt-and-suspenders approach to transmission system planning." ALJs' Recommended Decision at 115. For example, the models did not include the output of generators that are under construction and will be adding power to the regional grid before 2011, the year in which PJM's models predict an onset of reliability issues. The ALJs further pointed out that the modeling in the Regional Plan was designed to yield only transmission solutions; accordingly, TrAIL Co. did not evaluate other technologies that would prevent a decline in reliability and be less environmentally intrusive. Specifically, the ALJs found that TrAIL Co. did not consider "facility upgrades or tweaks to the 765 kV PATH line, transmission constrained dispatch, high-voltage direct current (HVDC) lines, upgrades or repairs to existing transmission facilities, or any non-transmission solutions." Id. at 116.

In response to the ALJs' conclusion that TrAIL Co.'s evidence did not establish a service reliability problem, the Commission summarily reversed.[4] It stated:

Here, we find that the record establishes that [the high voltage transmission lines and substations are] needed to address reliability issues and [are] the best alternative available to achieve that result.

Commission's Adjudication at 36. The Commission provided no specific citations

2. PJM Interconnection is a regional transmission organization that coordinates the movement of wholesale electricity in a region that includes 13 states ranging from Illinois to New Jersey and Michigan to North Carolina.

3. Notably, reliability was not even studied until after PJM announced its plan to address service needs in the eastern part of the 13-state region by building generators in Ohio, Kentucky and West Virginia, the easiest place to build them, and distributing electrical service from there. It did not consider a local

solution, i.e., building generators closer to the places where the need for electric service exists.

4. The Commission is opaque on the reliability basis for granting TrAIL Co. a certificate of public convenience. "Reliability" can justify the grant of a certificate of public convenience for any and every proposed high voltage transmission line because, theoretically, any addition to the grid will improve reliability.

to the record to support this conclusory statement. It did not refute the ALJs' well-supported and detailed findings or analyze their legal conclusions. The Commissioners simply leaped to a different conclusion.

The majority states that the regulation presumes that a high voltage transmission line less than two miles in length presents a minimum adverse impact upon the environment. I disagree with that interpretation of the regulation. It is true that the application process is less burdensome where the proposed line will be less than two miles in length, but that does not mean that the standards that regulate the construction and placement of high voltage transmission lines have been, or can be, relaxed by the administrative agency charged with the enforcement of these standards.

A utility may not construct a new transmission line of any length without the express approval of the Commission. Where the utility proposes a line shorter than two miles, it may seek approval by means of a "letter of notification." 52 Pa.Code § 57.72(d)(1)(vi).[5] Based upon the content of the letter of notification, the Commission may approve the application. On the other hand, the Commission may respond to the letter by requiring a full application. In any case, this abbreviated filing procedure does not alter the substantive standards by which any proposed high voltage transmission line is evaluated. It is a moot point here because TrAIL Co. chose to file the full-fledged application, not the "letter of notification."

Chapter 57 of the Commission's regulations, entitled "Electric Service," was promulgated under Section 501 of the Public Utilities Code, 66 Pa.C.S. § 501. Subchapter G of Chapter 57, "Commission Review of Siting and Construction of Electric Transmission Lines," establishes the substantive standards for the approval of *any* proposed high voltage transmission line. These regulations are binding on the Commission and have the force and effect of law. *Sierra Club v. Pennsylvania Public Utility Commission*, 702 A.2d 1131, 1135 n. 5 (Pa.Cmwlth.1997).

The regulations provide that when an application is submitted, a hearing is required. 52 Pa.Code § 57.75(a).[6] At these

5. Section 57.72 authorizes the abbreviated "letter of notification" in lieu of an application for high voltage transmission lines less than two miles in length. The regulation provides, in relevant part:

(1) A letter of notification may be filed with the Commission in lieu of the application process set forth in §§ 57.71–57.76 for the following:

\* \* \*

(vi) [A high voltage] line having a proposed route of 2 miles or less.
52 Pa.Code § 57.72(d)(1)(vi). Further, a letter of notification shall contain:
(i) The information described in subsection (c)(1)–(3), (5) and (6) [namely, applicant name; notice recipients; general route description; general statement of need; and statement of safety considerations].

(ii) The anticipated construction commencement date and the proposed in-service date of the project.
(iii) Evidence to show that the size, character, design and configuration of the proposed [high voltage] line will not substantially alter its right-of-way where the letter is filed under paragraph (1)(i)–(v).
(iv) A statement identifying the filing date on which the filing of the letter of notification was or is to be made, together with substantially the language set forth in paragraph (5).
52 Pa.Code § 57.72(d)(4). An applicant filing a letter of notification does not need to produce an environmental impact study with that letter. However, the Commission may request the filing of such a study.

6. It states, in relevant part, as follows:

hearings, the Commission must accept and consider evidence on, *inter alia,* the following matters:

 (1) The present and future necessity of the proposed [high voltage transmission] line in furnishing service to the public.

 (2) The safety of the proposed [high voltage transmission] line.

 (3) The impact and the efforts which have been and will be made to minimize the impact, if any, of the proposed [high voltage transmission] line upon the following:

 (i) Land use.

 (ii) Soil and sedimentation.

 (iii) Plant and wildlife habitats.

 (iv) Terrain.

 (v) Hydrology.

 (vi) Landscape.

 (vii) Archeologic areas.

 (viii) Geologic areas.

 (ix) Historic areas.

 (x) Scenic areas.

 (xi) Wilderness areas.

 (xii) Scenic rivers.

 (4) The availability of reasonable alternative routes.

52 Pa.Code § 57.75(e)(1)–(4). After the evidence is received, the Commission may grant or deny the application for the proposed high voltage transmission line with "conditions or modifications [to] the location, construction, operation or maintenance of the line." 52 Pa.Code § 57.76(a). The Commission may not grant the application, with or without conditions, unless it determines:

> Upon the filing of an application, the Commission will set the time and place for hearing or hearings of the application and will thereupon require the applicant to cause the weekly publication for two consecutive weeks of a notice of hearing.... The notice of hearing for publication shall contain

 (1) That there is a need for [the high voltage transmission line].

 (2) That it will not create an unreasonable risk of danger to the health and safety of the public.

 (3) That it is in compliance with applicable statutes and regulations providing for the protection of the natural resources of this Commonwealth.

 (4) That it will have minimum adverse environmental impact, considering the electric power needs of the public, the state of available technology and the available alternatives.

52 Pa.Code § 57.76(a)(1)–(4).

In sum, Subchapter G presumes that a high voltage transmission line degrades the environment. The regulation does not ban new lines, but it requires the utility to make a compelling case for their construction. It requires the Commission to find unequivocally that the new line "will have a minimum adverse environmental impact, *considering ... available technology and the available alternatives.*" 52 Pa.Code § 57.76(a)(4) (emphasis added).

The Commission is not satisfied that these standards have been met. Accordingly, it has directed TrAIL Co. to do post-approval environmental impact studies, as a condition to the approval. However, these studies should have been submitted with the application and then reviewed and challenged in the course of the administrative hearing on TrAIL Co.'s proposal.

The ALJs found that TrAIL Co.'s application was defective because it lacked the

> a brief description of the proposed [high voltage] line, its location, a statement of the date, time and place of the hearing and of its purpose and a statement as to where and when a copy of the application is available for public examination.

52 Pa.Code § 57.75(a).

information necessary for its evaluation. The ALJs explained that

> TrAIL Co is asking this Commission to trust it to do all of the right things after approving what is basically a concept of a project rather than one that is fully developed. We suggest that this Commission would be shirking its oversight review duty were it to do so.

ALJs' Recommended Decision at 190. The Commissioners agree that TrAIL Co.'s application is incomplete. Their adjudication expressed concern over the "lack of alternative route descriptions" and general "lack of information" in the application. Commission's Adjudication at 43, 46. Nevertheless, the Commission approved the applications conditioned on TrAIL Co.'s submission of the missing information "prior to commencing construction." *Id.* at 47.

Neither the Public Utility Code nor Chapter 57 of the Pennsylvania Code authorizes the issuance of a certificate of public convenience before the submission of information relevant to the merits of a utility's proposal to construct a high voltage transmission line. The Commissioners are not authorized to approve an incomplete application. For that reason alone, the Commission's adjudication should be reversed. In addition, the Commission's conditional approval does violence to the process required for every application for certificate of public convenience. To allow the application to be completed after the certificate of public convenience is granted is problematic for two reasons.

First, it suggests that the adjudication is not a "final order" within the meaning of the Administrative Agency Law, 2 Pa.C.S. §§ 501–508, 701–704. This means that the Commission has retained jurisdiction so that it can modify or even revoke its approval, should the studies expose problems not anticipated by the Commission or even by TrAIL Co. Accordingly, the Commission's order is interlocutory, and our review is premature.

On the other hand, if the Commission has issued a "final order," then the burden has been shifted, improperly, from the applicant seeking approval of a new transmission line. To have the approval revoked or modified on the basis of post-approval amendments to TrAIL Co.'s application means that a new proceeding may have to be instituted to have the approval rescinded or modified should the amendments not yield the desired information. The burden will be placed upon the Commission or upon Intervenors to prove the grounds for a revocation or modification. It is the applicant utility, however, which properly bears the burden of proving the need for a certificate of public convenience.[7]

The Commissioners are quick to congratulate themselves for their ability to look beyond the parochial interests of Pennsylvania in favor of regional interests. The Commission's job is not to advance broad-mindedness. Its job is a precise one: to enforce Pennsylvania statutes and regulations. Nothing in Subchapter G of the regulation suggests that the Commission should consider regional interests

---

**7.** The settlement between TrAIL Co., West Penn Power Company and Greene County eliminated the proposed "Prexy Facilities" project, which was part of TrAIL Co.'s original application, and is not part of this appeal. The ALJs found that TrAIL Co. did not prove a need for the Prexy Facilities. The Commission directed the parties to participate in a collaborative process to identify alternatives to the Prexy Facilities, in part because TrAIL Co. did not consider technological alternatives to a new substation and new high voltage transmission line. By that logic, the Commission should have denied that part of TrAIL Co.'s proposal on appeal here.

when deciding whether to grant a certificate of public convenience for the construction of a new substation and high voltage transmission line in Pennsylvania. Regionalism is addressed in the Public Utility Code, but not in the way understood by the majority Commissioners. The Commission is required to work with others, including the North American Electric Reliability Council, to ensure continued "adequate, safe and reliable electric service to the citizens and businesses *of this Commonwealth*." 66 Pa.C.S. § 2805(a) (emphasis added). There is no Loudoun County in this Commonwealth.

Indeed, the Commissioners' allegiance to regional interests appears to have trumped their allegiance to Pennsylvania consumers and landowners. TrAIL Co.'s proposed new high voltage transmission line will drive up the cost of energy in West Penn's service territory. These customers "will have to pay for generation after the 502 Junction to Loudoun line is built [and] they will be required to pay increased transmission costs." Vice Chairman Christy's Dissenting Statement at 4. West Penn customers alone will be responsible for $14.5 million per year in additional costs attributed to the various TrAIL Co. lines, including $10 million for that part of the line located in Pennsylvania. In West Virginia, those property owners burdened by the new high voltage transmission lines will be compensated, in part, with free electric service so long as the lines remain in place. No such deal was struck for Pennsylvania landowners. As Vice Chairman Christy aptly noted, the Pennsylvania line imposes all of the costs and none of the benefits on one segment of the public: Western Pennsylvania consumers.

For the foregoing reasons, I would reverse the Commission's adjudication granting TrAIL Co.'s exceptions to the recommended decision of the ALJs.